T.C. Memo. 2011-271

UNITED STATES TAX COURT

ALLEN POWERSTEIN AND RITA POWERSTEIN ROSEN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ALLEN POWERSTEIN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 30261-89, 13443-92.[1]  Filed November 16, 2011.

Mitchell I. Horowitz and Micah G. Fogarty, for petitioners.

Stephen R. Takeuchi and Robert W. Dillard, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  At the heart of these cases is petitioner

Allen Powerstein (Mr. Powerstein), a former certified public

_____

[1]These cases were consolidated for purposes of trial, briefing, and opinion pursuant to Rule 141(a).

accountant (C.P.A.) who in 1993 pleaded guilty to criminal tax evasion in violation of section 7201.[2] At issue are the 1984 through 1988 joint Federal income taxes of petitioners Mr. Powerstein and Rita Powerstein Rosen (Ms. Rosen) and the 1989 individual Federal income tax of Mr. Powerstein.

In docket No. 30261-89, petitioners petitioned the Court to redetermine respondent's determination of the following Federal income tax deficiencies and additions to tax:

| | | Additions to Tax | | | | |
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
|---|---|---|---|---|---|---|
| 1984 | $28,664 | $14,374 | $7,918 | -0- | -0- | $7,166 |
| 1985 | 48,948 | 24,474 | 9,520 | -0- | -0- | 12,237 |
| 1986 | 38,186 | -0- | -0- | $28,640 | $5,095 | 9,547 |
| 1987 | 39,749 | -0- | -0- | 29,935 | 2,952 | 9,937 |
| 1988 | 30,915 | 23,186 | -0- | -0- | -0- | 7,729 |

In his answer, respondent adjusted the deficiencies and additions to tax, decreasing the amounts for 1984 and 1985 and increasing the amounts for each of the years 1986 through 1988 as follows:

| | | Additions to Tax | | | | |
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
|---|---|---|---|---|---|---|
| 1984 | $1,599 | $842 | $442 | -0- | -0- | -0- |
| 1985 | 23,492 | 11,695 | 4,549 | -0- | -0- | $5,873 |
| 1986 | 47,566 | -0- | -0- | $35,353 | ([1]) | 11,892 |
| 1987 | 58,251 | -0- | -0- | 43,536 | ([1]) | 14,563 |
| 1988 | 58,187 | 43,563 | -0- | -0- | -0- | 14,547 |

[1]Respondent determined that if the addition to tax under sec. 6653(b)(1)(A) applies, then the addition to tax under sec. 6653(b)(1)(B) applies in an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment that is due to fraud.

---

[2]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts have been rounded.

In docket No. 13443-92, Mr. Powerstein petitioned the Court to redetermine respondent's determination of a $49,000 deficiency in his 1989 Federal income tax and a $36,750 fraud penalty under section 6663.

After concessions by the parties,[3] we decide: (1) Whether the burden of proof shifts to respondent with respect to his reconstruction of petitioners' net worth for 1984 through 1988. We hold that it does to the extent stated herein; (2) whether petitioners omitted income of $5,668, $42,212, $107,089, $153,670, and $153,351, for 1984 through 1988, respectively. We hold that they omitted income of $3,624, $83,739, $85,702,

---

[3] In docket No. 30261-89, the parties agree that petitioners (1) failed to report interest income of $2,148, $79, $239, $101, and $2,409 for 1984 through 1988, respectively; (2) understated dividend income of $138, $200, and $196 for 1984 through 1986, respectively; (3) received $563 of dividends for 1987 of which $282 is excluded from income as a nontaxable distribution; (4) failed to report net capital gains of $3,167 for 1984, (5) failed to report net capital gains of $2,282 and instead reported a net capital loss of $2,926, resulting in a $5,208 adjustment for 1986; and (6) overstated capital losses by $2,747 and $875 for 1987 and 1988, respectively. In docket No. 13443-92, the parties agree that for 1989 Mr. Powerstein (1) failed to report gross receipts of $56,063 on Schedule C, Profit or Loss From Business; (2) is entitled to deduct $67,250 of legal fees as an expense on Schedule C; (3) is not entitled to a $122 loss on Schedule F, Profit or Loss From Farming; (4) failed to report capital gains of $4,058; (5) is not entitled to a fuel tax credit of $63; (6) is liable for self-employment tax of $6,250; and (7) is not liable for a fraud penalty under sec. 6663 but is liable for an accuracy-related penalty under sec. 6662. We deem petitioners to have conceded that the period of limitations for assessment of their 1984 through 1988 Federal income taxes is open and that Ms. Rosen is not entitled to relief under sec. 6013(e), by virtue of the fact that these issues were not raised at trial or on brief. See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001).

$145,266, and $142,637, for 1984 through 1988, respectively; (3) whether petitioners are entitled to deductions related to Mr. Powerstein's accounting practice. We hold they are to the extent stated herein; (4) whether petitioners are entitled to a $22,290 loss as reported on their 1988 Schedule F. We hold they are not; (5) whether petitioners may use special income-averaging provisions pursuant to section 1305. We hold they may not; (6) whether Mr. Powerstein may deduct $65,778 of interest which respondent jeopardy-assessed and collected by levy in 1989. We hold he may not; (7) whether petitioners are liable for additions to tax under section 6653(b) for 1984 through 1988. We hold that Mr. Powerstein is to the extent stated herein, and that Ms. Rosen is not; and (8) whether petitioners are liable for additions to tax under section 6661 for 1985 through 1988. We hold they are.

FINDINGS OF FACT

I. Preliminaries

The parties submitted to the Court numerous stipulations of fact and accompanying exhibits. The stipulated facts and exhibits submitted therewith are incorporated herein by this reference. We find the stipulated facts accordingly. When their respective petitions were filed, petitioners resided in Florida.

II. Mr. Powerstein

Mr. Powerstein was raised in Brooklyn, New York (Brooklyn), and he served in the U.S. Army from May 4, 1958, through May 3,

1964.  He holds a bachelor of business administration degree in accounting from the City College of New York, and he has completed work towards a master's degree.  He was a C.P.A. from June 1967 until at least January 1987.

Between May 1964 and 1976 Mr. Powerstein was an accountant at various accounting firms and businesses.  Beginning in 1965 and at all relevant times, he operated a bookkeeping, accounting, and tax return preparation business; namely, Allen D. Powerstein, CPA (accounting firm).

III. Ms. Rosen

Ms. Rosen was born and raised in Brooklyn.  She graduated from high school and did not attend college.  Over the years, Ms. Rosen was mostly a homemaker though she occasionally held a job during some of the years in issue.

IV.  Petitioners

Petitioners were married in June 1957 and have two children; namely, Madelyn Ballard (Ms. Ballard) and Irene Powerstein (Ms. I. Powerstein).  Mr. Powerstein was the household's primary income producer, and he regularly provided financial assistance to Ms. Ballard into her adult years.  Throughout the years in issue, petitioners incurred typical household expenses, including amounts for groceries, utilities, and other necessities.

Petitioners were married until July 1989, at which time they legally divorced.[4]

## V.   The Ballards

Ms. Ballard and Michael Ballard (Mr. Ballard) (collectively, the Ballards) were married in 1983, and they had at least one child; namely, K.B.  Mr. Ballard was raised on a farm in Arkansas.  He drank alcohol during the years in issue, and he has been convicted of driving under the influence.

## VI.  Coral Springs Residence

Petitioners lived in Brooklyn until 1972, when they moved their family and household property to Miami, Florida.  They paid $6,700 for a parcel of land in Coral Springs, Florida, and subsequently built a home (Coral Springs residence) thereon. They deposited $500 with respect to that residence and secured a $60,472 residential loan (first Glendale mortgage) from Glendale Federal Bank (Glendale Bank) after construction of the residence was completed.[5]  Petitioners' actual cost of constructing that home exceeded its estimated cost by approximately $11,191.  In addition to principal and interest due under the first Glendale mortgage, petitioners also impounded (escrowed) $153 per month

---

[4]Despite their divorce, petitioners continued to live together, Mr. Powerstein continued to support the family, and Ms. Rosen continued to maintain the household.

[5]The first Glendale mortgage was issued by First Federal Savings & Loan of Broward County (First Federal).  We refer to First Federal and its successors as Glendale Bank.

for real estate taxes.  In 1978 petitioners moved in to the Coral Springs residence, and they continued to live there through August 1984.

Petitioners refinanced the first Glendale mortgage in February 1984 with a $100,000 loan (second Glendale mortgage) from Glendale Bank.  At the closing of the second Glendale mortgage, petitioners escrowed 5 months of real estate taxes totaling $453.  Payments due under the second Glendale mortgage impounded $91 per month for real estate taxes.  During 1984 petitioners made nine payments against the second Glendale mortgage totaling $9,324, of which $820 was paid through escrow for real estate taxes.  During 1985 petitioners made two payments against the second Glendale mortgage totaling $2,072.

In early-to-mid-1984, petitioners contracted to sell the Coral Springs residence to Dale Underhill (Mr. Underhill) and Mona Underhill (Ms. Underhill) (collectively, the Underhills) for $112,000.  The Underhills deposited $8,000 to an interest-bearing account (Underhill account) at Atlantic Federal Savings & Loan (Atlantic Bank) which was jointly held by Mr. Powerstein and Mr. Underhill in trust for Ms. Rosen and Ms. Underhill.  That deposit served as a downpayment for the purchase of the Coral Springs residence, and as of December 31, 1984, the Underhill account had earned interest of $259.

The Underhills leased the Coral Springs residence beginning in August 1984 and continued to do so through April 1985, at which time they secured financing to close the sale. Although the Underhills paid rent of $1,000 per month to petitioners, this income was not reported as taxable on petitioners' Federal income tax returns. After the Underhills began leasing the Coral Springs residence, petitioners moved to Romeo, Florida (Romeo). On April 12, 1985, the sale of the Coral Springs residence closed for $112,000, and petitioners realized net proceeds of $107,201. At the closing, petitioners were charged $288 for unpaid county taxes from January 1 through April 11, 1985, and $234 for taxes related to 1980.

VII. Vacation Home

On November 14, 1981, petitioners purchased a residence in Lake Lure, North Carolina. In or around 1983, the Powersteins exchanged that property and additional consideration to purchase a second residence in Lake Lure, North Carolina (vacation home). The cost of acquiring the vacation home totaled $7,333, and petitioners paid $53 of real estate taxes on it in 1984.

VIII. Romeo Property

A. Overview

In August 1983 petitioners purchased an 11.06-acre wooded parcel of land (Romeo property) in Romeo for $20,009. Shortly thereafter, the Ballards moved to the Romeo property to make the

land habitable. With the help of local workers, the Ballards cleared the Romeo property and installed fences, roads, and other improvements. The Ballards left their jobs to move to the Romeo property and, having earned no wages in 1984, received support from petitioners. The Ballards lived on the Romeo property in a tent for approximately 6 months and eventually constructed a wooden cabin which they lived in temporarily.

B.    Improvements

Petitioners purchased two mobile homes in 1983 and 1984, and situated those homes on the Romeo property in close proximity. First, they purchased a mobile home (Pine Street mobile home) for $26,164 which the Ballards used as their residence. Second, petitioners purchased a mobile home (Addison mobile home) for $23,431 which they lived in. By August 1984 the Ballards and petitioners had also improved the Romeo property with, among other improvements, a three-stall barn, a pump house, fencing, and a septic tank.

C.    Mortgages

Petitioners mortgaged the Romeo property with a $26,000 loan (first Sun Bank mortgage) from Sun Bank of Ocala (Sun Bank) in January 1984. On or about October 5, 1984, petitioners retired the first Sun Bank mortgage with a second loan (second Sun Bank mortgage) for $53,918 which was secured by the Romeo property. The second Sun Bank mortgage remained until October 5, 1987, when

petitioners refinanced that mortgage with a $51,068 loan (first Mid State mortgage) from Mid State Federal Savings and Loan (Mid State). Petitioners satisfied the first Mid State mortgage through a loan (second Mid State mortgage) in or around 1988.

### D. Farming Activities

Although they lacked experience to do so, petitioners became minimally engaged in farming activities after moving to the Romeo property. Without conducting due diligence of the agricultural feasibility of using the Romeo property as a farm, they purchased, among other things, a tractor for $10,500 and a chainsaw for $600. They raised approximately 16 head of cattle, 2 horses, pigs, and chickens; and although they sold 2 head of cattle at a livestock market in 1985, they mostly used these animals for personal consumption and enjoyment. They also attempted to grow several types of crops without success. By July 1989 petitioners had abandoned their farming activity.

## IX. Petitioners' Support of the Ballards

### A. Overview

During the years in issue Mr. Powerstein furnished considerable support to the Ballards. By letter dated April 1986, petitioners stated that they paid support to the Ballards of $4,870 in 1985 and $1,635 through April 1986. This support included rent, utility payments, food, and medical bills.

B.   M&M

The Ballards incorporated M&M Tree Service, Inc. (M&M) as equal shareholders on or about October 13, 1983.  Through M&M, the Ballards provided landscaping and tree services in central Florida during 1984 and 1985.  Mr. Powerstein provided most, if not all, of the financing for the startup and operation of M&M. He purchased various assets for M&M, including the tractor and the chainsaw which petitioners used in their farming activity.

C.   Income

The Ballards received minimal income during the years in issue, and they received support in addition to that described above.  The Ballards' 1984 joint return reported zero wages, interest income of $131, a $28,659 distributive loss from M&M, and total income of negative $28,528.  The Ballards' 1985 joint return reported wages of $780, interest income of $83, a $19,714 distributive loss from M&M, and total income of negative $18,851. The Ballards' 1986 joint return reported wages of $5,963, interest income of $439, and total income of $6,402.  The Ballards' 1987 joint return reported wages of $8,749, interest income of $135, a $2,098 net farm loss, and total income of $6,786.  The Ballards' 1988 joint return reported wages of $13,108, interest income of $86, a $3,348 net farm loss, and total income of $9,846.

X.   Financial Arrangement With Clients

After petitioners moved to the Romeo property in 1984, Mr. Powerstein continued to operate his accounting firm in South Florida, and he frequently traveled there by car.  He was diligent in preparing original and amended Federal income tax returns for his clients, but far from honest.  He significantly understated income and overstated deductions on his clients' Federal income tax returns as early as 1983.  For example, Mr. Powerstein wrote the following letter to two clients in 1985:

> Received your recent letter and IRS letter regarding the 1983 taxes.  Before I explain the real meaning of their letter, I must point out that I am not surprised that we got such a letter and that the IRS computer is accurate in tracking bank interest reported on 1099s.  We must carefully reply to [the] IRS and explain what we did and if there is any additional tax to pay, and I am not saying there will be, we will pay it at the appropriate time.
>
> *    *    *    *    *    *    *
>
> Here is why I like their letter:
>
> 1) I reported the Ford pension of $4,634, but showed the entire amount to be non-taxable and the IRS did not question this.  I know you are both aware of this.
>
> 2) I claimed Airlift International as a worthless security in the amount of $4,251, however it really cost you $1,251.  IRS did not question this.
>
> 3) I claimed a $2,000 exclusion for All-Savers Certificates at American Savings, when in fact you never had an All-Saver Certificate.  IRS did not question this.
>
> 4) I claimed a $200 exclusion against the Merrill Lynch dividends.  These dividends do not qualify for the exclusion.  IRS did not question this.

5) I claimed 3-additional exemptions * * * which the IRS did not question. Each exemption is $1,000 or a total of $3,000 which we are really not entitled to.

6) I claimed a political party contribution credit of $100. IRS did not question this.

7) I claimed a residential energy credit carryforward from 1982 which the IRS did not question.

Here is what the IRS picked up:

1) I reported * * * 50% of the Chase Federal interest that you earned in 1983 on account no. (IRS does not know the account number as they show the number to be 10-zeroes). * * *

2) I reported a CD penalty forfeiture of $2,479 which the IRS has no record of receiving from any of our banks. I know the IRS is correct and we will concede on this point at the time I answer on the Chase Federal account. * * *

      *     *     *     *     *     *     *

* * * Please understand that the IRS sends these letters out to anyone who fails to report the amount shown on the 1099, namely in our case Chase Federal. The CD penalty is something else. This is a routine letter but important to answer on time. Just think if they decided to audit the return on all the points I raised in the early part of this letter. You would owe a fortune. Speak to noone at the bank about the IRS letter but only that we need an amended 1099.

For preparing his clients' amended Federal income tax returns, Mr. Powerstein charged a contingent fee of one-third to one-half of the amount refunded to his clients. He reported the return address on the amended return as a P.O. Box in his name, and the refunds were sent to that address. Upon receipt of a refund check, Mr. Powerstein contacted his client, went to the bank with that client, deposited the check, and took his "share".

XI.  Loan Applications

In connection with their various mortgages, petitioners completed and submitted various bank loan applications that reported income greater than that reported on their joint Federal income tax returns.  First, they estimated the net income from the accounting firm for 1977 as $24,185 on a residential loan application to Glendale Bank dated August 2, 1977 (1977 loan application).  However, petitioners reported business income from the accounting firm of only $3,289 on their 1977 joint Federal income tax return (1977 joint return).  Second, they estimated the net income from the accounting firm for 1978 as $31,262 on a residential loan application to Glendale Bank dated September 19, 1978 (1978 loan application).  However, petitioners reported business income from the accounting firm of only $3,060 on their 1978 joint Federal income tax return (1978 joint return).

Third, they estimated the net income from the accounting firm for 1983 as $27,500 on a residential loan application to Sun Bank dated December 23, 1983 (1983 loan application).  However, petitioners reported business income from the accounting firm of only $195 on their 1983 joint Federal income tax return (1983 joint return).  Attached to the 1983 loan application were purported joint Federal income tax returns for petitioners for 1981 and 1982 (purported 1981 and 1982 returns, respectively) which reported business income from the accounting firm of

$24,028 and $23,886, respectively. The amounts reported as business income from the accounting firm on the purported 1981 and 1982 returns did not match the amounts reported on the 1981 and 1982 joint Federal income tax returns (respectively, 1981 and 1982 joint returns) that petitioners filed with respondent. Fourth, on a residential loan application to Sun Bank dated June 20, 1984 (1984 loan application), petitioners estimated their 1984 net income from the accounting firm as $26,000. However, petitioners reported a business loss from the accounting firm of $996 on their 1984 joint Federal income tax return (1984 joint return).

XII. Investments

A. Bank Accounts

During the years at issue, petitioners maintained at least 40 bank accounts. Most of the accounts were held jointly in petitioners' names. However, Mr. Powerstein held certain accounts jointly or in trust for Pearl Powerstein (Ms. P. Powerstein), his step-mother; Ann Pasternak (Ms. Pasternak), his aunt; or Stacey Korman (Ms. Korman), his cousin.

B. Investments

During the subject years petitioners also purchased more than $200,000 in stock and debt of various companies. Included in the stock purchased were 775 shares of Charme Properties, Inc. (Charme). Charme filed a chapter 11 bankruptcy petition on May

11, 1984, which the bankruptcy court subsequently converted to a chapter 7 liquidation in 1985. Charme forfeited its corporate charter with the Delaware secretary of state on September 24, 1985, though the bankruptcy continued into April 1995 when final distributions were made.

XIII. Asset Transfers

Between February 23 and May 25, 1989, Mr. Powerstein and/or Ms. Rosen transferred approximately 30 bank accounts to Ms. Ballard and Ms. I. Powerstein, either individually or as trustees for K.B. On March 6, 1989, Mr. Powerstein and Ms. Rosen deeded the vacation home to Ms. Ballard and Ms. I. Powerstein as joint tenants for $10. Also on March 6, 1989, Mr. Powerstein and Ms. Rosen deeded the Romeo property to Ms. Ballard and Ms. I. Powerstein as joint tenants for $10.

XIV. Federal Tax Reporting

Petitioners filed joint Federal income tax returns for years before 1989, including returns for 1983 through 1988 (1983 through 1988 joint returns, respectively). The 1983 joint return reported wages of $7,629, interest income of $14,305, dividend income of $227 of which $200 was excludable from gross income, business income of $195, a capital loss of $696, and total income of $21,475. Attached to the 1983 joint return was Schedule B, Interest and Dividend Income, which reported interest earned from All-Savers Certificates of $2,000.

The 1984 joint return reported wages of $5,244, interest income of $19,396; dividend income of $138, all of which was treated as nontaxable; a business loss of $996; net capital gain of $168; and total income of $23,812. Attached to the 1984 joint return was a Schedule C which reported income that Mr. Powerstein received from two clients. The 1985 joint return reported interest income of $23,705; dividend income of $427, of which $200 was excluded from gross income; business income of $392; net capital gain of $2; and total income of $24,326. The 1986 joint return reported interest income of $27,288; dividend income of $602, of which $200 was excluded from gross income; a business loss of $5,505; a net capital loss of $2,926; and total income of $19,259. The 1987 joint return reported interest income of $30,224; dividend income of $263; a business loss of $8,924; a capital loss of $2,976; and total income of $18,587. The 1988 joint return reported interest income of $35,298, dividend income of $822, a business loss of $24,279, a capital loss of $1,131, and total income of $10,710. Attached to the 1988 joint return was a Schedule C which reported a $1,989 loss from the accounting firm and a Schedule F on which petitioners reported a $22,290 loss from growing vegetables and melons. Also attached to the 1988 joint return was Form 4562, Depreciation and Amortization, on which petitioners reported 7-year property with a depreciable basis of $1,442.

Mr. Powerstein filed an individual Federal income tax return for 1989 (1989 return). The 1989 return reported interest income of $7,214, dividend income of $974, a business loss of $118,953, capital gains of $8,458, a farm loss of $122, and total income of negative $102,429.

## XV. Criminal Proceeding

### A. Preliminary Investigation

In early 1989 the Questionable Refund Detection Team (QRDT) of the Atlanta, Georgia, Service Center forwarded information to the Criminal Investigation Division (CID) of the Internal Revenue Service (IRS) in Jacksonville, Florida, indicating that Mr. Powerstein had prepared false Federal tax returns on behalf of numerous individuals. CID investigated Mr. Powerstein, contacted third parties, and issued summonses in furtherance of that investigation.

### B. Search Warrant

On July 19, 1989, special agents with CID executed a search warrant at the Addison mobile home, three detached outbuildings, and automobiles located on the Romeo property. Among the documents seized were financial records related to the accounting firm, client files, correspondence, check registers, deposit tickets, envelopes containing cash receipts, and bank documents and statements. CID did not find books, records, cash disbursement journals, or bank reconciliation papers. An

envelope with more than $1,000 was also found in the Addison mobile home. The special agents who executed the search warrant inventoried the seized items by description and location found.

C.   Jeopardy Assessment

Respondent determined that collection of the deficiencies allegedly due from petitioners was in jeopardy because, among other things, Mr. Powerstein was perceived as a flight risk who placed assets beyond the reach of the Federal Government by transferring them to nominees. Respondent's auditor used the net worth and expenditures method to determine the amounts to be jeopardy-assessed. The auditor made these determinations over a 4-day period in which information seized from the Romeo property was examined and analyzed.

For jeopardy assessment purposes, respondent's auditor calculated petitioners' increase in net worth between December 1988 and July 1989. Petitioners' opening net worth was determined from the 1983 loan application, and their ending net worth was determined by reference to bank account balances as of July 1989. The difference between petitioners' ending and opening net worth was allocated equally over each of the years 1984 through 1988; i.e., the increase in net worth was divided by 5. Additional adjustments were made for each of the years 1984 through 1988 for living expenses and available cash. The net

worth increase for each of the years 1984 through 1988 was determined to be business income from the accounting firm.

On July 24, 1989, respondent jeopardy-assessed taxes, additions to tax, and interest against petitioners for each of the years 1984 through 1988. See sec. 6861. On July 25, 1989, respondent issued a notice of jeopardy assessment to petitioners for 1984 through 1988 in the following amounts:

| | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
| 1984 | $28,664 | $14,374 | $7,918 | -0- | -0- | $ 7,166 |
| 1985 | 48,948 | 24,474 | 9,520 | -0- | -0- | 12,237 |
| 1986 | 38,186 | -0- | -0- | $28,640 | $5,095 | 9,547 |
| 1987 | 39,749 | -0- | -0- | 29,935 | 2,952 | 9,937 |
| 1988 | 30,915 | 23,186 | -0- | -0- | -0- | 7,729 |

Respondent also jeopardy-assessed interest of $65,778 against petitioners and collected that amount in 1989 by levying upon petitioners' bank accounts. In total, respondent seized $449,513 from petitioners' various accounts.[6] After jeopardy assessment of petitioners' assets was made, respondent continued his criminal investigation by summoning at least 36 banks and interviewing at least 36 witnesses. Respondent subsequently redetermined petitioners' net worth and reflected those determinations in his answer.

_____

[6]Respondent took the position that as of July 24, 1989, the total tax, additions to tax, and interest purportedly due from petitioners for 1984 through 1988 was $429,424 (total liability). As of the date of the trial in these cases, respondent has not refunded petitioners the $20,089 difference between the amount seized ($449,513) and the total liability ($429,424).

D.   <u>Indictment</u>

A Federal grand jury in the U.S. District Court for the Middle District of Florida indicted Mr. Powerstein for various Federal tax offenses in a 13-count indictment (indictment).  The indictment charged Mr. Powerstein with (1) one count of corruptly obstructing and impeding the due administration of the internal revenue laws by preparing and filing false and fraudulent Federal income tax returns for himself and clients in violation of section 7212(a); (2) eight counts of knowingly and willfully aiding and assisting in the preparation and presentation of materially false income tax returns of clients in violation of section 7206(2); (3) three counts of knowingly and willfully attempting to evade taxes during 1986 through 1988 in violation of section 7201; and (4) one count of publishing a false power of attorney in violation of 18 U.S.C. sec. 495.

E.   <u>Plea Agreement and Sentencing</u>

On July 2, 1993, Mr. Powerstein signed a plea agreement in which he pleaded guilty to one count of corrupt interference with the administration of the internal revenue laws in violation of section 7212(a) and one count of criminal tax evasion in violation of section 7201.  In connection with the plea agreement, Mr. Powerstein agreed that he prepared and filed false and fraudulent Federal income tax returns individually and on behalf of his client-taxpayers in order to fraudulently obtain

tax refunds.  Mr. Powerstein agreed that he understated his 1987 income by approximately $150,159 and that he owed the U.S. Treasury approximately $53,715 of Federal income tax for 1987.

Mr. Powerstein admitted to preparing fraudulent Forms W-2, Wage and Tax Statement, which overstated the Federal income taxes withheld for 79 client-taxpayers.  He also admitted to, on several occasions, creating false and fraudulent Forms W-2 for client-taxpayers that identified firms or business that had never employed, paid wages to, or withheld Federal income taxes from those client-taxpayers.  In total, the District Court found that the total tax losses attributable to Mr. Powerstein were "slightly less than" $1.5 million.[7]  On March 31, 1994, the District Court sentenced Mr. Powerstein to 63 months of imprisonment, 3 years of supervised release, a fine of $100,000, and a special assessment of $100.

---

[7]The tax losses included Federal income tax deficiencies and interest for 1984 through 1988 of $191,812, tax losses of $246,615 related to the 79 client-taxpayers for whom Mr. Powerstein prepared fraudulent returns, and tax losses of almost $1.1 million attributable to Mr. Powerstein's clients whose returns were not examined.  We observe that the tax losses are slightly more than $1.5 million.

XVI. <u>Pleadings</u>

    A.    <u>Docket No. 30261-89</u>

        1.    <u>Notice of Deficiency and Petition</u>

By notice of deficiency dated September 21, 1988, respondent determined deficiencies in petitioners' 1984 through 1988 Federal income taxes and additions to tax as follows:

| | | | Additions to Tax | | |
|------|------------|------------|------------|------------|------|
| | | Sec. | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1) | 6653(b)(2) | 6653(b)(1)(A) | 6653(b)(1)(B) | 6661 |
| 1984 | $28,664 | $14,374 | $7,918 | -0- | -0- | $ 7,166 |
| 1985 | 48,948 | 24,474 | 9,520 | -0- | -0- | 12,237 |
| 1986 | 38,186 | -0- | -0- | $28,640 | $5,095 | 9,547 |
| 1987 | 39,749 | -0- | -0- | 29,935 | 2,952 | 9,937 |
| 1988 | 30,915 | 23,186 | -0- | -0- | -0- | 7,729 |

The amounts determined in the notice of deficiency were equal to those determined in the jeopardy assessment; i.e., both determinations used the same method for calculating net worth. Thus, the notice of deficiency reports petitioners' opening net worth as of December 31, 1983, their closing net worth as of December 31, 1988, and the increase or decrease during that time as follows:

| | 12/31/83 | 12/31/88 | Increase/(Decrease) |
|------|------|------|------|
| Stocks | $5,000 | $43,024 | $38,024 |
| Bank accounts | 85,000 | 529,700 | 444,700 |
| Real estate | 107,201 | 42,461 | (64,740) |
| Total assets | 197,201 | 615,185 | 417,984 |
| Total liabilities | 73,000 | -0- | -0- |
| Net worth | 124,201 | 615,185 | 490,894 |

Respondent then divided the $490,894 increase to petitioners' net worth between 1984 and 1988 by 5 to arrive at petitioners' annual

net worth increase, or $98,197.  Respondent then determined

petitioners' business income, as follows:

|  | 12/31/84 | 12/31/85 | 12/31/86 | 12/31/87 | 12/31/88 |
|---|---|---|---|---|---|
| Increase in net worth | $98,197 | $98,197 | $98,197 | $98,197 | $98,197 |
| Additions: |  |  |  |  |  |
| Personal living expenses | 25,085 | 26,781 | 26,540 | 26,540 | 26,540 |
| Subtractions: |  |  |  |  |  |
| Cash available | 20,095 | 3,479 | 29,903 | 13,162 | 10,710 |
| Business income | 103,187 | 121,499 | 94,834 | 111,575 | [1]98,680 |

[1]We observe that respondent's calculation of business income does not equal increase in net worth plus personal living expenses less cash available.

Petitioners petitioned the Court in response to the notice

of deficiency, and the Court docketed that case at docket No.

30261-89.

2.  Answer

In the answer, respondent asserted that because the notice

of deficiency averaged petitioners' understatements evenly over

1984 through 1988, petitioners' reconstructed taxable income was

(1) overstated for 1984 and 1985, and (2) understated for 1986,

1987, and 1988.  Accordingly, respondent asserted adjustments to

the deficiencies and additions to tax determined to be due from

petitioners as follows:

|  |  | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
| 1984 | $1,599 | $842 | $442 | -0- | -0- | -0- |
| 1985 | 23,492 | 11,695 | 4,549 | -0- | -0- | $5,873 |
| 1986 | 47,566 | -0- | -0- | $35,353 | ([1]) | 11,892 |
| 1987 | 58,251 | -0- | -0- | 43,536 | ([1]) | 14,563 |
| 1988 | 58,187 | 43,563 | -0- | -0- | -0- | 14,547 |

[1]50 percent of the interest due on the deficiency.

For purposes of the answer, respondent used the net worth method to determine increases to petitioners' 1984 through 1988 taxable income as follows:

| | 12/31/83 | 12/31/84 | 12/31/85 | 12/31/86 | 12/31/87 | 12/31/88 |
|---|---|---|---|---|---|---|
| Net worth computation: | | | | | | |
| Cash on hand | $188,159 | $231,552 | $231,848 | $325,992 | $457,059 | $565,765 |
| Investments | 26,662 | 21,441 | 21,441 | 23,703 | 32,935 | 47,469 |
| Personal assets | 26,099 | 36,599 | 36,599 | 36,687 | 36,687 | 51,015 |
| Real estate | 96,376 | 143,371 | 81,171 | 81,171 | 81,171 | 81,171 |
| Additional investments | 9,065 | 7,422 | 7,787 | 7,712 | 10,082 | 10,321 |
| Total assets | 346,361 | 440,385 | 378,846 | 475,265 | 617,934 | 755,741 |
| Loans and mortgages | 72,807 | 153,627 | 52,674 | 51,420 | 51,023 | 51,497 |
| Charge accounts | -0- | -0- | -0- | -0- | -0- | -0- |
| Accumulated depreciation | 6,637 | 10,535 | 10,535 | 6,093 | 7,755 | 9,373 |
| Total liabilities | 79,444 | 164,162 | 63,209 | 57,513 | 58,778 | 60,870 |
| Net worth | 266,917 | 276,223 | 315,637 | 417,752 | 559,156 | 694,871 |
| Less prior year's net worth | N/A | 266,917 | 276,223 | 315,637 | 417,752 | 559,156 |
| Net worth increase | N/A | 9,306 | 39,414 | 102,115 | 141,404 | 135,715 |
| Personal expenses | N/A | 25,085 | 26,781 | 26,540 | 28,549 | 28,549 |
| Less nontaxable income | N/A | 5,333 | 329 | 4,233 | 429 | 203 |
| Adjusted gross income | N/A | 29,058 | 65,866 | 124,422 | 169,524 | 164,061 |
| Less itemized deductions | N/A | 15,304 | 16,087 | 6,148 | 8,655 | 5,000 |
| Less exemptions | N/A | 3,000 | 3,120 | 3,240 | 5,700 | 5,850 |
| Corrected taxable income | N/A | 10,754 | 46,659 | 115,034 | 155,169 | 153,211 |
| Reported taxable income | N/A | 5,086 | 4,447 | 7,945 | 1,499 | (140) |
| Increase to taxable income | N/A | 5,668 | 42,212 | 107,089 | 153,670 | 153,351 |

### a. Cash On Hand

Respondent determined petitioners' cash on hand as follows:

| Cash in Banks | 12/31/83 | 12/31/84 | 12/31/85 | 12/31/86 | 12/31/87 | 12/31/88 |
|---|---|---|---|---|---|---|
| American Savings | $37,301 | $35,003 | -0- | -0- | -0- | -0- |
| Atlantic Bank | 3,169 | 63,430 | $10,047 | $64,208 | $160,961 | $202,448 |
| BankAtlantic | 51,352 | -0- | -0- | -0- | -0- | -0- |
| Barnett Bank | -0- | -0- | -0- | -0- | -0- | 2,670 |
| Biscayne Federal | 10,846 | 10,884 | 10,930 | 10,965 | 10,185 | 10,185 |
| Brooklyn Federal | 158 | 218 | 178 | 142 | 150 | 148 |
| California Federal | -0- | 10,762 | 75,490 | 11,912 | 25,468 | 10,133 |
| Carteret Savings | 10,237 | 6,368 | 6,485 | 6,592 | 6,699 | 6,827 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Centrust Savings | -0- | -0- | -0- | 10,000 | 10,000 | 20,897 |
| Citicorp Savings | 6,518 | 6,419 | 56,678 | 126,445 | 96,775 | 96,860 |
| City Federal Savings | 20,233 | 20,233 | 20,353 | 20,358 | 20,364 | 20,343 |
| Commonwealth | 2,590 | 22,643 | 22,697 | 22,750 | 2,804 | 2,857 |
| Dime Savings | 135 | 526 | 559 | 591 | 624 | 659 |
| First Nationwide | 2,513 | 2,858 | 3,142 | -0- | -0- | -0- |
| First Union | 102 | 108 | 114 | 120 | 126 | 132 |
| Fund for Government Inc. | 89 | 39 | 39 | 39 | 40 | 40 |
| Glendale Bank | -0- | 10,512 | -0- | -0- | -0- | -0- |
| Greater New York | 3,562 | -0- | -0- | -0- | -0- | -0- |
| Hollywood Federal | 1,073 | 1,134 | 1,198 | 1,265 | 1,337 | 1,412 |
| Mid State Federal | -0- | -0- | -0- | 11,446 | 85,464 | 154,840 |
| Roosevelt Bank | 1,049 | 1,253 | 1,438 | 2,159 | 1,562 | 814 |
| Safra Bank | 36,832 | 38,858 | 22,500 | 37,000 | 34,500 | 34,500 |
| Sun Bank | 400 | 304 | -0- | -0- | -0- | -0- |
| Total | 188,159 | 231,552 | 231,848 | 325,992 | 457,059 | 565,765 |

### b. Investments

Respondent valued petitioners' investments in 1983 through 1988 at $35,727, $28,863, $29,228, $31,415, $43,017, and $57,790, respectively. Included in this determination were 775 shares of Charme which petitioners contend are worthless.

### c. Personal Assets

Respondent valued petitioners' personal assets as follows:

| Description | 12/31/83 | 12/31/84 | 12/31/85 | 12/31/86 | 12/31/87 | 12/31/88 |
|---|---|---|---|---|---|---|
| 1986 Caprice classic | -0- | -0- | -0- | $9,373 | $9,373 | $9,373 |
| International tractor | -0- | $10,500 | $10,500 | 10,500 | 10,500 | 10,500 |
| 1982 Chevy pickup | $15,564 | 15,564 | 15,564 | 15,564 | 15,564 | 15,564 |
| 1982 Caprice | 10,535 | 10,535 | 10,535 | -0- | -0- | -0- |
| 1984 Plymouth Reliant | -0- | -0- | -0- | -0- | -0- | 4,284 |
| 1985 Mercury | -0- | -0- | -0- | -0- | -0- | 8,500 |
| 1973 Ford truck | -0- | -0- | -0- | -0- | -0- | 2,544 |
| 1980 Dodge aspen | -0- | -0- | -0- | 1,000 | 1,000 | -0- |
| 1973 Ford S/W | -0- | -0- | -0- | 250 | 250 | 250 |
| Total | 26,099 | 36,599 | 36,599 | 36,687 | 36,687 | 51,015 |

Petitioners contend that they owned additional personal property, including a copier.

### d.   Real Estate

Respondent valued petitioners' real estate as follows:

| Description | 12/31/83 | 12/31/84 | 12/31/85 | 12/31/86 | 12/31/87 | 12/31/88 |
|---|---|---|---|---|---|---|
| Romeo property | $20,009 | $20,009 | $20,009 | $20,009 | $20,009 | $20,009 |
| Coral Springs residence | 62,200 | 62,200 | -0- | -0- | -0- | -0- |
| Vacation home | 7,333 | 7,333 | 7,333 | 7,333 | 7,333 | 7,333 |
| Addison mobile home | -0- | 23,431 | 23,431 | 23,431 | 23,431 | 23,431 |
| Well | 1,375 | 1,375 | 1,375 | 1,375 | 1,375 | 1,375 |
| Fenceposts | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 |
| Crossties | 501 | 501 | 501 | 501 | 501 | 501 |
| Pine Street mobile home | 2,600 | 26,164 | 26,164 | 26,164 | 26,164 | 26,164 |
| Total | 96,375 | 143,371 | 81,171 | 81,171 | 81,171 | 81,171 |

### e.   Loans and Mortgages

Respondent valued petitioners' loans and mortgages as

follows:

| Description | 12/31/83 | 12/31/84 | 12/31/85 | 12/31/86 | 12/31/87 | 12/31/88 |
|---|---|---|---|---|---|---|
| Glendale Bank | $72,807 | -0- | -0- | -0- | -0- | -0- |
| Glendale Bank | -0- | $99,873 | -0- | -0- | -0- | -0- |
| Sun Bank | -0- | 53,754 | $52,674 | $51,420 | -0- | -0- |
| Mid State | -0- | -0- | -0- | -0- | $51,023 | -0- |
| Mid State | -0- | -0- | -0- | -0- | -0- | $51,497 |
| Total | 72,807 | 153,627 | 52,674 | 51,420 | 51,023 | 51,497 |

Petitioners contend that there is an additional loan outstanding

for $19,500 from Atlantic Bank.

### 3.   Amended Answer

Respondent amended his answer on April 27, 2007 (amended

answer), to assert that Mr. Powerstein is collaterally estopped

from denying (1) his liability for the additions to tax imposed

by section 6653(b)(1)(A) and (B); and (2) the facts necessary to

convict him under counts 1 and 11 of the indictment.

### 4.  Second Amended Answer

Respondent's net worth computation determined nondeductible expenditures allocable to petitioners of $135,504 on the basis of average annual expenditures for a family of three as determined by the Bureau of Labor Statistics (BLS).  In his second amendment to answer (second amended answer) filed with the Court on April 21, 2010, respondent revised his determination of petitioners' nondeductible personal expenditures.  The second amended answer determined nondeductible personal expenditures allocable to petitioners of $241,789 using a composite of check registers from petitioners' various bank accounts, BLS, and petitioners' 1984 through 1988 joint returns.  In particular, respondent recalculated petitioners' personal expenditures using a combination of BLS, check registers, and petitioners' tax returns.  The second amended answer also asserted an increased deficiency if respondent's personal living expenses analysis is sustained.

### B.  Docket No. 13443-92

On March 30, 1992, respondent issued to Mr. Powerstein a notice of deficiency which determined a $49,000 deficiency in Mr. Powerstein's 1989 Federal income tax and a $36,750 fraud penalty under section 6663.  Mr. Powerstein petitioned the Court in response to that notice of deficiency, and the Court docketed the case at docket No. 13443-92.

OPINION

## I.   Burden of Proof

Petitioners moved the Court in limine to modify the burden of proof with respect to amounts shown on respondent's net worth schedule because, petitioners contended, respondent seized but did not return some of their personal and business records.  We denied petitioners' motion without prejudice to arguing the point in their opening brief, and they again asserted on brief that the burden of proof should shift to respondent.  Absent a written stipulation to the contrary, these cases are appealable to the U.S. Court of Appeals for the Eleventh Circuit.  See sec. 7482(b)(1)(A), (2).

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers must prove those determinations erroneous in order to prevail.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In cases involving unreported income, however, the presumption of correctness does not attach until the Commissioner supports his determinations with a minimal "'evidentiary foundation linking the taxpayer to the alleged income-producing activity.'"  Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993) (quoting Weimerskirch v. Commissioner, 596 F.2d 358, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977)), affg. T.C. Memo. 1991-636.  Once the Commissioner has produced evidence linking the taxpayers to an income-

producing activity, the burden of proof shifts to the taxpayers to rebut that presumption by establishing that the Commissioner's determinations are arbitrary or erroneous. Blohm v. Commissioner, supra at 1549.

The Court of Appeals for the Eleventh Circuit has described the situation in which the burden of proof shifts to the Commissioner as "rare" and only occurring "where the Commissioner has introduced no substantive evidence, and the evidence shows that the claimed tax deficiency arising from unreported income was derived by the government from unreliable evidence." Gatlin v. Commissioner, 754 F.2d 921, 923 (11th Cir. 1985), affg. T.C. Memo. 1982-489. To satisfy his initial burden of production, respondent introduced records which were seized from petitioners or summoned from third parties. Those records establish that petitioners received, but did not report, substantial amounts of income between 1984 and 1988. On the basis of this credible evidence, we are satisfied that respondent has made the requisite showing for his determinations as set forth in the notice of deficiency to be entitled to the general presumption of correctness. See Schad v. Commissioner, 87 T.C. 609, 620 (1986) (connecting a taxpayer with funds that form the basis of the deficiency is sufficient for the presumption of correctness to attach), affd. without published opinion 827 F.2d 774 (11th Cir. 1987).

As relevant here, the presumption of correctness is modified in several respects.  First, respondent asserted a claim for an increased deficiency in his answer for each of the years 1986 through 1988, and he bears the burden of proof as to those increased deficiencies.  See Rule 142(a)(1).  Second, respondent amended his answer to assert that Mr. Powerstein is collaterally estopped from denying liability for the fraud additions to tax for 1987, and he bears the burden of proof with respect to that newly pleaded matter.  See id.  Third, respondent revised his determination of petitioners' nondeductible personal expenditures in the second amended answer, and he bears the burden of proof with respect to that issue.  See id.  We have decided the issues herein with these general principles in mind.  To the extent that we have not specifically addressed whether respondent has met his burden of proof with respect to any of the foregoing issues, we decline to do so because the record favors respondent.

II.  Unreported Income

A.  Overview

Gross income includes all income from whatever source derived, including income derived from business.  Sec. 61(a)(2).  Taxpayers are required to maintain books and records sufficient to establish the amount of their Federal income tax liability.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  In the absence of such books and records, the Commissioner is authorized to

reconstruct the taxpayers' income by any method that clearly reflects income. Sec. 446(b); <u>Parks v. Commissioner</u>, 94 T.C. 654, 658 (1990). One such method that courts have long recognized as reasonable, and the method used by respondent in these cases, is the net worth method. See <u>Holland v. United States</u>, 348 U.S. 121, 131 (1954).

Under the net worth method, the Commissioner reconstructs the taxpayers' income by determining the taxpayers' net worth at the beginning and end of each of the years in issue. The difference between those amounts for each successive year is the taxpayers' annual net worth increase (or decrease). The net worth for each year is then adjusted by adding nondeductible personal expenditures and subtracting nontaxable receipts. <u>Id.</u> at 125. An increase in net worth in any given year creates an inference of taxable income in that year, provided that the Commissioner shows a likely source of the unreported income, or negates possible nontaxable sources. See <u>United States v. Massei</u>, 355 U.S. 595 (1958).

In the instant cases, petitioners failed to maintain books or records from which their Federal tax liabilities could be computed, and respondent reconstructed petitioners' income using the net worth method. As the starting point for determining petitioners' net worth, respondent used the net worth statement included in the 1983 loan application. Respondent then computed

petitioners' net worth for each of the years from 1984 through 1988 and determined an aggregate increase in net worth of $427,954. Respondent attributed the source of this increase to Mr. Powerstein's accounting firm.

Petitioners challenge the accuracy of respondent's income reconstruction on four principal grounds. First, petitioners contend that respondent overstated their opening net worth by including, among other things, cash in certain bank accounts which they did not wholly own. Second, petitioners claim that respondent failed to make various adjustments to their net worth in each of the years in issue. Third, petitioners assert that respondent's calculation of nondeductible personal expenditures is erroneous, duplicative, and/or unsupported by the record. Fourth, petitioners argue that respondent's calculation of nontaxable receipts is understated.

B. Disputed Opening Net Worth

Petitioners cite three reasons for challenging respondent's computation of their opening net worth. First, they contend that respondent's calculation erroneously included cash in bank accounts held jointly or in trust for Ms. P. Powerstein, Ms. Pasternak, and Ms. Korman. Second, they claim that respondent failed to account for household furnishings which they owned at the start of 1984. Third, they assert that respondent failed to adjust the basis of the Coral Springs residence for certain

additions and improvements.  We agree with petitioners for the most part, and consider their arguments seriatim.

### 1.  Bank Accounts

Petitioners begin by arguing that respondent incorrectly included in their opening net worth, cash in bank accounts which Mr. Powerstein held jointly with or in trust for Ms. P. Powerstein, Ms. Pasternak, and Ms. Korman.  First, petitioners claim that cash in nine accounts at Safra Bank was improperly included in their opening net worth because those accounts were jointly owned with Ms. P. Powerstein and that she funded one-half of the initial deposits made to those accounts.[8]  We agree.  To satisfy their burden, petitioners rely upon the testimony of Mr. Powerstein and bank records for these accounts.  Included in the records are account signature cards which list the owners' address as being in Brooklyn and a letter requesting changes to those accounts that is signed by Mr. Powerstein and Ms. P. Powerstein.  We understand the address referenced in the signature cards to be that of Ms. P. Powerstein, and we credit Mr. Powerstein's testimony in the light of the corroborating documentary evidence.  Accordingly, we find that petitioners' opening net worth should be reduced by $11,250, which is Ms. P. Powerstein's share of cash in the accounts held jointly with Mr.

---

[8]The accounts at Safra Bank claimed to be held jointly with Ms. P. Powerstein are account numbers ending 1178, 1770, 1202, 1203, 1204, 1205, 1206, 2334, and 2335.

Powerstein.  Cf. <u>Unger v. Commissioner</u>, T.C. Memo. 2000-267 (including cash in jointly held bank accounts in a taxpayer's net worth where inclusion of those accounts was supported by documentary evidence).

Second, petitioners ascribe error to the inclusion of cash in accounts at Brooklyn Federal Savings & Loan (Brooklyn Federal) and Roosevelt Savings Bank (Roosevelt Bank) in their opening net worth.[9]  According to petitioners, these accounts are not attributable to them because they were jointly owned with and wholly funded by Ms. Pasternak.  We agree.  Petitioners again rely upon the testimony of Mr. Powerstein and bank records for these accounts.  The account records for each of the Brooklyn Federal and Roosevelt Bank accounts establish that those accounts were held in trust for Susan Mark, Mr. Powerstein's cousin.  A signature card for the Roosevelt Bank account was signed by Mr. Powerstein and Ms. Pasternak, and listed separate addresses for each account holder.  We again credit Mr. Powerstein's testimony given the supporting documentary evidence.  Accordingly, we find that petitioners' opening net worth for cash on deposit at Brooklyn Federal and Roosevelt Bank should be reduced by $158 and $1,049, respectively.  Cf. <u>id.</u>

---

[9]The accounts alleged to be jointly held with Ms. Pasternak are account number ending 0790 at Brooklyn Federal and account number ending 9211 at Roosevelt Bank.

Third, petitioners maintain that an account at Citicorp Bank (Citicorp), which was held in trust for Ms. Korman and funded by her father, is not an asset belonging to them.[10] We agree. Petitioners carry their burden with the testimony of Mr. Powerstein and bank records which establish that this account was held in trust for Ms. Korman. We credit Mr. Powerstein's testimony in the light of the supporting documentary evidence. Accordingly, we find that petitioners' opening net worth for cash held at Citicorp should be reduced by $217. See Estate of Cardulla v. Commissioner, T.C. Memo. 1986-307.

### 2. Household Furnishings

Petitioners next argue that respondent erroneously excluded an allowance for personal household furnishings from their opening net worth. According to petitioners, their opening net worth should be increased to reflect household items which they moved from Brooklyn to the Coral Springs residence. We agree. To support this increase in opening net worth, petitioners rely upon a bill of lading from the moving company that transported their furnishings, proof of insurance for $64,800 of personal property located at the Coral Springs residence, and Mr.

---

[10]The account claimed to be held in trust for Ms. Korman is account number ending 7299 at Citicorp. We observe that Mr. Powerstein testified at trial that the $1,533 balance in account number ending 161-8 at Atlantic Bank was also attributable to Ms. Korman. We consider petitioners to have conceded this argument since they do not address it on brief. See Nicklaus v. Commissioner, 117 T.C. at 120.

Powerstein's testimony that the household items cost approximately $30,000.  We credit Mr. Powerstein's testimony as reasonable and hold that petitioners' opening net worth is increased by $30,000.

### 3.   Basis in the Coral Springs Residence

Petitioners further argue that their opening net worth should be increased to reflect $11,191 of costs incurred in constructing the Coral Springs residence and $14,529 of expenses incurred to improve that property.  As petitioners see it, these additional costs increase their basis in the Coral Springs residence and thereby affect their opening net worth.  We agree in part.  With respect to the $11,191 of construction costs, petitioners rely upon Mr. Powerstein's direct testimony, his handwritten notes regarding the payment of such expenses in the late 1970s, and the 1978 loan application, all of which support petitioners' claim that they incurred such expenses.  Given the corroborating evidence, we credit Mr. Powerstein's testimony as reasonable, and hold that petitioners' basis in the Coral Springs residence is increased by $11,191.  See sec. 1016(a)(1).

With respect to the $14,529 in additional improvements, petitioners rely solely upon the testimony and handwritten notes of Mr. Powerstein to establish such an increase to their basis in the Coral Springs residence.  We decline to credit this evidence absent further corroborating evidence, such as testimony of the

contractors who performed the work or receipts for the work performed.[11]  Mr. Powerstein maintained receipts and records related to a variety of expenses associated with petitioners' investments.  Although Mr. Powerstein's handwritten notes reference canceled checks and invoices as source documents, petitioners did not provide copies of those items.  Accordingly, we hold that petitioners' basis increase in the Coral Springs residence is limited to $11,191.

C.   Disputed Increases to Net Worth

Petitioners next contend that respondent's determination of their annual net worth increase for each of the years in issue failed to account for various adjustments to their assets and liabilities.  We consider petitioners' contentions in turn.

1.   Cash in Banks

We previously held that respondent incorrectly included in petitioners' opening net worth cash in bank accounts held jointly or in trust for Ms. Pasternak, Ms. P. Powerstein, and Ms. Korman. On the basis of the record as a whole, and taking into account the parties' stipulations as to bank accounts which petitioners owned, we hold that petitioners' net worth for 1984, 1986, 1987, and 1988 should be reduced by $17,948, $3,807, $1,982, and

---

[11]In the absence of such records, we assume that they did not exist or were unfavorable to petitioners' position.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

$1,247, respectively.[12]  We also hold that petitioners' net worth for 1985 should be increased by $21,895.[13]

### 2.   Investments

Petitioners maintain that their net worth should be reduced to exclude the value of 775 shares of Charme stock which were worthless during the years in issue.  We disagree.  Taxpayers generally bear the burden of proving that the stock in question was "wholly worthless" and when it becomes worthless.  See Boehm v. Commissioner, 326 U.S. 287, 294 (1945); sec. 1.165-5(c), Income Tax Regs.  We ordinarily treat stock as worthless if it has neither liquidating value nor potential value.  Austin Co. v. Commissioner, 71 T.C. 955, 970 (1979).  A corporation's stock has liquidating value if the corporation's assets exceed its liabilities.  Id.  A corporation's stock has potential value if there is a reasonable expectation that it will become valuable in the future.  Morton v. Commissioner, 38 B.T.A. 1270, 1278 (1938), affd. 112 F.2d 320 (7th Cir. 1940).  Where a corporation declares

[12]These adjustments relate to bank accounts at Brooklyn Federal, Citicorp, Roosevelt Bank, and Safra Bank.  The 1984 adjustment reflects the parties' stipulation that petitioners' bank account should be reduced by $8,259 for amounts deposited to the Underhill account.  We attribute any difference in amounts to rounding.

[13]Included in the 1985 adjustment are a reduction in net worth of $13,108 related to various bank accounts, and an increase in net worth of $35,003 as reflected by petitioners' receipt of a certificate of deposit from California Federal Bank (California Federal).

bankruptcy, ceases to conduct business, liquidates, or has a receiver appointed, its stock may be worthless because these events can limit or destroy the stock's potential value. See id. That rule, however, is not absolute. See, e.g., Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950); Patten & Davies Lumber Co. v. Commissioner, 45 F.2d 556, 558 (9th Cir. 1930), revg. a Memorandum Opinion of this Court dated July 29, 1929; see also Scagliotta v. Commissioner, T.C. Memo. 1996-498; Storch v. Commissioner, T.C. Memo. 1985-17.

In applying the foregoing principles, we are unable to agree with petitioners that the Charme stock became wholly worthless during any of the years in issue. Although Charme declared bankruptcy in 1985, its bankruptcy continued into 1995, which suggests that its stock had at least some residual liquidation value in 1985. Such value might have included, for example, liquidating distributions to the stockholders after creditors' claims had been satisfied. Absent additional facts surrounding the financial viability of Charme, the assets it held when placed into chapter 7 liquidating bankruptcy, the expenses of administration, or a fixed and identifiable event establishing complete worthlessness, we decline to accept that the stock was devoid of all present or potential value. See Miami Beach Bay Shore Co. v. Commissioner, 136 F.2d 408, 409 (5th Cir. 1943) (stock is not worthless until the "last vestige of value has

disappeared"). Accordingly, we hold that petitioners' net worth includes the $1,750 value of the Charme stock.

### 3. Household Property

We previously held that respondent incorrectly omitted from petitioners' opening net worth a $30,000 allowance for personal household furnishings. Petitioners now contend that they are entitled to a nondeductible loss to reflect the disposition of that property when they moved from the Coral Springs residence to the Addison mobile home. We are not persuaded. Without elaboration, petitioners contend on brief that they disposed of "a good amount" of these furnishings because the Addison mobile home was "substantially smaller" than the Coral Springs residence. As support for their entitlement to the nondeductible loss, petitioners state that they did not claim a charitable contribution deduction for that property, which suggests that they donated it. Absent a receipt of the donation or other corroborating evidence, we decline to accept petitioners' self-serving statements. We find petitioners' claims especially implausible given that the property listed in the bill of lading included bedroom furniture, electronics, living room furniture, office furniture, and household items, all of which conceivably would have been suitable for use in the Addison mobile home. On the basis of the record at hand, petitioners have not proved their entitlement to a nondeductible loss for personal property

in 1985.  Accordingly, we hold that petitioners' net worth is increased by $30,000 for each of the years in issue to reflect petitioners' household property.

### 4.  Real Estate

#### a.  Coral Springs Property

We previously held supra p. 37 that petitioners' basis in the Coral Springs residence should be increased by $11,191 to account for construction costs related to that home.  We similarly hold that petitioners' basis in the Coral Springs residence for 1984 is increased by $11,191.  See sec. 1016(a)(1).

#### b.  Romeo Property

Petitioners contend that respondent understated their basis in the Romeo property.  According to petitioners, their basis in the Romeo property should be increased by $10,284 to reflect costs of clearing and improving that property, support paid to the Ballards, and costs of hiring workers to assist in clearing that property.  Petitioners rely upon a number of methods of proof to carry their burden.  First, they rely upon the direct testimony of Mr. Powerstein, Mr. Ballard, and Ms. Ballard.  Second, they offered an appraisal which reported improvements to that property such as a three-stall barn, a pump house, and a septic tank.  Third, they submitted checks, receipts, and letters establishing that they paid support to the Ballards while the Romeo property was developed and hired workers to help in the

clearing of that land.  Fourth, they offered the handwritten notes of Mr. Powerstein listing the expenses incurred in connection with developing the Romeo property.  We also note that petitioners' estimates of the cost of developing the Romeo property reasonably excluded (1) expenses related to M&M, and (2) improvements that respondent had credited them with.  Given the overwhelming evidence introduced to corroborate petitioners' claim, we hold that their basis in the Romeo property is increased by $10,284.  See id.

### c.   Addison Mobile Home

Petitioners maintain that their basis in the Addison mobile home should be reduced by $970 from $23,431 to $22,461.  We disagree.  In an attempt to meet their burden, petitioners rely upon the handwritten notes of Mr. Powerstein showing a purchase price for the Addison mobile home of $22,461.  Respondent, on the other hand, submitted canceled checks establishing that the cost of acquiring the Addison mobile home was $23,431.  As compared with Mr. Powerstein's handwritten schedule, we find the checks relied upon by respondent to be more persuasive.  Accordingly, we sustain respondent's determination that petitioners' basis in the Addison mobile home was $23,431.

### 5.   Loans and Mortgages

Petitioners assert that their net worth should be adjusted to reflect a $19,500 loan (Atlantic loan) from Atlantic Bank.  We

agree. Petitioners submitted evidence showing that they became liable on the Atlantic loan in or around 1984. First, they made a large deposit to a bank account with Atlantic Bank on February 2, 1984, which we believe reasonably could have included the proceeds from the Atlantic loan. Second, petitioners submitted a bank deposit ticket showing that a $19,500 loan with Atlantic Bank was repaid in 1985. Third, petitioners presented handwritten notes of Mr. Powerstein showing that a $19,500 note was taken from Atlantic Bank. Accordingly, we hold that petitioners' net worth should be increased by $19,500 in 1984 and 1985, the years during which the Atlantic loan was outstanding.

6.  Depreciation

Respondent determined that petitioners were entitled to adjustments for accumulated depreciation of $10,535, $10,535, $6,093, $7,755, and $9,373 in 1984 through 1988, respectively. Petitioners counter that they are entitled to additional depreciation of $200, $349, $299, $250, and $452 in 1984 through 1988, respectively. These adjustments stem from petitioners' alleged use of the Addison mobile home and the copier in Mr. Powerstein's accounting firm. As discussed more fully below, we conclude that expenses related to the copier, but not to the Addison mobile home, were ordinary and necessary business expenses of Mr. Powerstein's accounting firm. We thus hold that petitioners' adjustments for accumulated depreciation in 1984

through 1988 are $10,535, $10,535, $6,093, $7,755, and $9,538, respectively.

   D.   Disputed Nondeductible Personal Expenditures

      1.   Overview

Given the absence of information concerning petitioners' specific personal living expenses, respondent used BLS figures to calculate petitioners' nondeductible personal living expenses for 1984 through 1988 and reflected his determinations in the answer. After more than 20 years, respondent amended the answer a second time to assert increases in petitioners' nondeductible personal expenses of $106,285.  The revised expenditures were based on a composite of BLS figures and expenditures reflected in petitioners' three main checking accounts.  Because the adjustments in nondeductible personal living expenses increased petitioners' annual net worth for each of the years 1984 through 1988, we treat the revised personal nondeductible expenditures as a new matter on which respondent bears the burden of proof.  See Rule 142(a); Michas v. Commissioner, T.C. Memo. 1992-161.

Petitioners offered substantial proof to rebut respondent's imputation of items under the BLS and additional adjustments.  In particular, petitioners submitted evidence that proved that (1) they did not make certain expenditures attributed to them under BLS, or (2) respondent erroneously classified expenses as nondeductible that were in fact deductible.  Although we mostly

agree with petitioners' challenges to respondent's revised adjustments, that agreement is not unlimited. We explain seriatim only those adjustments proposed by petitioners with which we disagree or those items that we feel warrant explanation. To the extent that we have rejected any adjustment proposed by respondent as to petitioners' nondeductible personal expenditures, we have done so because respondent failed to persuade us that such an adjustment was proper.

## 2. Alcoholic Beverages

Respondent imputed to petitioners allowances of $275, $286, $272, $294, and $268 for alcoholic beverages for 1984 through 1988, respectively. Although petitioners testified that they did not consume alcohol during the years in issue, they also testified that they provided most (if not all) of the Ballards' support from 1984 through 1986. Mr. Ballard was described at trial as a "social drinker", and he was convicted of driving under the influence. We thus believe it reasonable to impute expenses for alcoholic beverages to petitioners for 1984 through 1986 because petitioners supported the Ballards, at least one of whom consumed alcohol. We do not believe it reasonable to impute expenses for alcoholic beverages to petitioners during 1987 and 1988 because petitioners apparently did not support the Ballards during those years and petitioners testified credibly that they did not consume alcohol. Accordingly, we sustain respondent's

determination that nondeductible personal expenses for alcoholic beverages of $275, $286, and $272 for 1984 through 1986, respectively, are imputed to petitioners.

### 3. Second Glendale Mortgage

Respondent determined that petitioners made four payments on the second Glendale mortgage during 1985, including (1) two payments totaling $2,072 from an account with Atlantic Bank, and (2) two payments totaling $2,072 from other sources. Petitioners contend that they made only three payments during 1985 because it "appeared to be" petitioners' "custom and habit * * * to make payments around the fifteenth of each month." We disagree. Petitioners were obliged to make payments under the second Glendale mortgage until that note was satisfied. The sale of the Coral Springs residence closed on April 12, 1985, and the second Glendale mortgage was satisfied with the proceeds of that sale. Regardless of when petitioners customarily paid their mortgage, they were obligated for the pro rata share of the mortgage up until the date of repayment. We are satisfied that the amounts imputed to petitioners regarding the fourth mortgage payment covered April 1985 and sustain respondent's determination that petitioners made four payments on the second Glendale mortgage during 1985 totaling $4,144.

### 4.  First Sun Bank Mortgage

Respondent determined that petitioners made nine payments of approximately $342 on the first Sun Bank mortgage during 1984, including (1) four payments totaling $1,367 from an account with Atlantic Bank, and (2) five payments totaling $1,710 from other sources.[14]  According to petitioners, only seven payments were due under the first Sun Bank mortgage during 1984, and respondent has not proved that petitioners made any more than three payments under that mortgage.  We conclude that petitioners made seven payments under the first Sun Bank mortgage.  Payment due on that loan began on March 1, 1984, and continued until October 5, 1984, when petitioners retired the first Sun Bank mortgage with the proceeds of the second Sun Bank mortgage.  Thus, petitioners were required to make payments under the first Sun Bank mortgage for the 7-month period between March 1 and October 1, 1984, and for the first 5 days of October 1984.  Accordingly, we hold that petitioners incurred $2,392 of nondeductible personal expenditures in 1984 related to the first Sun Bank mortgage ($342 times 7 months).[15]

Petitioners contend that each of the seven payments paid under the first Sun Bank mortgage reduced the principal due on

---

[14]Monthly payments of approximately $342 were calculated as total payments of $1,367 divided by 4 months.

[15]The product of the items may not equal the total because of rounding.

that note.  We agree.  The first Sun Bank mortgage provided for monthly payments of principal and interest.  Because the record does not contain a copy of the note on which the first Sun Bank mortgage was based, we are forced to estimate the proper allocation between principal and interest on that note.  The short-term, semiannual-compounding applicable Federal rate (AFR) in effect for 1984 was 10 percent.[16]  See Rev. Rul. 84-163, 1984-2 C.B. 179.  Assuming a principal amount of $26,000, an interest rate of 10 percent, and a 3-year term, we find that principal due under the first Sun Bank mortgage was more than $2,392.  We limit the principal reduction to the amount petitioners proposed.

5.    Real Estate Taxes

Respondent imputed to petitioners real estate tax payments for the Coral Springs residence of $1,761 and $522 in 1984 and 1985, respectively.  With respect to 1984, petitioners counter that imputing real estate taxes to them is improper because (1) the first and second Glendale mortgages impounded real estate taxes of $91 per month, and (2) petitioners prepaid 5 months of real estate taxes totaling $453.  Petitioners concede that $367 of real estate taxes should be imputed to them in 1984.  We agree with petitioners that they paid real estate taxes through the

---

[16]We use the short-term AFR because the term of the first Sun Bank mortgage was 3 years.  See sec. 1274(d)(1)(A).  We use the semiannual-compounding convention as that most closely approximating the average daily interest rate for 1984.

first and second Glendale mortgages, and we hold that they need impute real estate taxes only in the amount conceded.

With respect to 1985, petitioners contend that respondent's imputation of real estate taxes is improper because those real estate taxes were paid from the closing proceeds on the sale of the Coral Springs residence.  We disagree.  The settlement statement with respect to the sale of the Coral Springs residence to the Underhills made two adjustments related to real estate taxes.  First, petitioners were assessed $288 for unpaid county taxes from January 1 through April 11, 1985.  Second, petitioners were charged $234 for taxes related to 1980.  Thus, petitioners paid $522 of real estate taxes with respect to the Coral Springs residence, which is the amount respondent imputed to them.  Accordingly, we sustain respondent's imputation of $522 in real estate taxes to petitioners for 1985.

### 6.   Improvements to Romeo Property

Petitioners contend that their nondeductible personal expenditures should be reduced by amounts expended to improve the Romeo property.  We agree.  We have held that petitioners incurred $10,284 in connection with improving the Romeo property, and those costs were already included in the increased basis of the Romeo property.  Accordingly, we hold that petitioners' nondeductible personal expenditures should be reduced by $10,284.

7.  Summary

On our review of the record as a whole and with due regard to respondent's burden of proof, we conclude that petitioners' nondeductible personal expenditures for 1984 through 1988 were $54,807, $39,452, $39,274, $22,854, and $22,261, respectively.

E.  Disputed Nontaxable Receipts

1.  Overview

As asserted in the answer, respondent's net worth computation adjusted petitioners' nontaxable receipts only for Federal income tax refunds for each of the years 1984 through 1988.  The parties have stipulated that petitioners received additional nontaxable receipts as follows:  (1) Qualified reinvested dividends of $549 and $331 in 1984 and 1985, respectively; and (2) nontaxable distributions of $282 in 1987.  Petitioners also contend that they are entitled to further adjustments for nontaxable items, including a 60-percent deduction on the net capital gain from the sale of the Coral Springs residence, certain interest income, an inheritance allegedly received from Ms. P. Powerstein, and a deduction for dual-income taxpayers filing a joint return.

2.  Gain on the Sale of the Coral Springs Residence

After accounting for settlement charges and credits due to the Underhills, petitioners realized $107,201 on the sale of the Coral Springs residence.  Petitioners' basis in the Coral Springs

residence was $79,133.  Therefore, their net capital gain on the sale of the Coral Springs residence is $28,068 ($107,201 less $79,133).  See sec. 1001(a).  The parties agree, and we conclude, that petitioners are entitled to a 60-percent deduction on that gain.  See sec. 1202(a) (allowing individual taxpayers a 60-percent deduction for net capital gains).  Accordingly, we hold that petitioners may exclude $16,841 ($28,068 times 60 percent).

### 3.  Interest Income

Petitioners contend that they are entitled to exclude $2,000 of interest income which they purportedly earned on an All-Savers Certificate issued by Safra Bank.  They cite no legal support for their entitlement to such an exclusion, instead referring the Court to their 1983 joint return on which they excluded $2,000 of interest income.  Section 128(a) allows for the exclusion from gross income of interest earned on a "depository institution tax-exempt savings certificate", sometimes referred to as an "All-Savers Certificate".  In the case of a joint return, the excludable amount during any taxable year is limited to $2,000 less the aggregate amount the taxpayers received in prior years.  Sec. 128(b).  Thus, taxpayers were entitled to a one-time $2,000 exclusion from gross income for interest paid on an All-Savers Certificate.  Because petitioners claimed a $2,000 exclusion on their 1983 joint return, we hold that they are not entitled to a similar exclusion for 1984.

### 4.  Inheritance

Petitioners contend that they are entitled to exclude Ms. P. Powerstein's share of nine bank accounts held at Safra Bank as nontaxable inheritance.  We are not persuaded.  Petitioners did not establish that Mr. Powerstein was a beneficiary under Ms. P. Powerstein's will (if she died testate) or as an heir at law (if she died intestate).  We thus hold that petitioners may not exclude as nontaxable income the balances of accounts held jointly with Ms. P. Powerstein.  Cf. Morrow v. Commissioner, T.C. Memo. 1967-242 (crediting a taxpayer's claim that amounts received as inheritance should be excluded from his net worth where that testimony was corroborated with a copy of the State estate tax return filed by the decedent's estate).

### 5.  Married Couple's Deduction

Petitioners further contend that they are entitled to a married couple's deduction for 1984.  We agree.  For taxpayers filing a 1984 joint return, section 221 allows dual-income married couples a deduction equal to 10 percent of the lesser of $30,000 or the "qualified earned income" of the spouse with the lower qualified earned income for the taxable year.[17]  Estate of Johnson v. Commissioner, T.C. Memo. 2001-182, affd. without

---

[17]The term "qualified earned income" is defined as an amount equal to the excess of (a) the earned income of the spouse for the taxable year, over (b) an amount equal to the sum of the certain deductions allowable under sec. 62 and properly allocable to or chargeable against earned income.  Sec. 221(b).

published opinion 129 Fed. Appx. 597 (11th Cir. 2005). Ms. Rosen earned $5,244 of income in 1984, which is less than the income that Mr. Powerstein earned in his accounting firm. Accordingly, petitioners are entitled to a married couple's deduction for 1984 of $524.

F.   Summary

On the basis of the foregoing, we determine increases in petitioners' taxable income as follows:

| | 12/31/83 | 12/31/84 | 12/31/85 | 12/31/86 | 12/31/87 | 12/31/88 |
|---|---|---|---|---|---|---|
| Net worth computation: | | | | | | |
| Cash on hand | $175,485 | $213,604 | $253,743 | $322,185 | $455,077 | $564,518 |
| Investments | 26,662 | 21,441 | 21,441 | 23,703 | 32,935 | 47,469 |
| Personal assets | 56,099 | 66,599 | 66,599 | 66,687 | 66,687 | 82,168 |
| Real estate | 123,599 | 170,588 | 91,455 | 91,455 | 91,455 | 91,455 |
| Additional investments | 10,474 | 8,831 | 9,196 | 7,947 | 10,317 | 10,556 |
| Total assets | 392,319 | 481,063 | 442,434 | 511,977 | 656,471 | 796,166 |
| Loans and mortgages | 72,807 | 173,127 | 52,674 | 51,420 | 51,023 | 51,497 |
| Charge accounts | -0- | -0- | -0- | -0- | -0- | -0- |
| Accumulated depreciation | 6,637 | 10,535 | 10,535 | 6,093 | 7,755 | 9,538 |
| Total liabilities | 79,444 | 183,662 | 63,209 | 57,513 | 58,778 | 61,035 |
| Net worth | 312,875 | 297,401 | 379,225 | 454,464 | 597,693 | 735,131 |
| Less prior year's net worth | N/A | 312,875 | 297,401 | 379,225 | 454,464 | 597,693 |
| Net worth increase | N/A | (15,474) | 81,824 | 75,239 | 143,229 | 137,438 |
| Personal expenses | N/A | 54,807 | 39,452 | 39,274 | 22,854 | 22,261 |
| Nondeductible loss | -0- | -0- | -0- | -0- | -0- | -0- |
| Less nontaxable income | N/A | 6,406 | 17,501 | 4,233 | 711 | 203 |
| Adjusted gross income | N/A | 32,927 | 103,775 | 110,280 | 165,372 | 159,496 |
| Less itemized deductions | N/A | 21,217 | 12,469 | 13,393 | 12,907 | 11,149 |
| Less exemptions | N/A | 3,000 | 3,120 | 3,240 | 5,700 | 5,850 |
| Corrected taxable income | N/A | 8,710 | 88,186 | 93,647 | 146,765 | 142,497 |
| Reported taxable income | N/A | 5,086 | 4,447 | 7,945 | 1,499 | (140) |
| Increase to taxable income | N/A | 3,624 | 83,739 | 85,702 | 145,266 | 142,637 |

It follows that petitioners' income for 1984 through 1988 is increased by $3,624, $83,739, $85,702, $145,266, and $142,637, respectively.  See sec. 61(a)(2).

III. Deductions

A.    Overview

Having determined the increases to petitioners' taxable income under the net worth method, we now examine the additional components of petitioners' taxable income for the years in issue. Although the parties agreed to many of the additional components of adjusted gross income, petitioners contend that they are entitled to deductions related to Mr. Powerstein's accounting firm and their farming activity.  Respondent apparently relies upon the general presumption afforded the notice of deficiency, not addressing these issues with any real precision.  We consider petitioners' contentions in turn.

B.    Schedule C Expenses

1.    Home Office Expense

Petitioners allege that Mr. Powerstein kept an office in the Addison mobile home that qualified as his principal place of business and that they are entitled to a deduction for home office expenses for 1984 through 1988.[18]  As a general rule, a

_____

[18]Although petitioners assert that they are entitled to a home office deduction with respect to the Coral Springs residence for 1984, they abandon that argument because according to them, the benefit of the depreciation deduction in 1984 will be offset

(continued...)

taxpayer is not allowed a deduction for expenses related to property that a taxpayer occupies as his or her residence.  Sec. 280A(a).  An exception to the general rule is found in section 280A(c)(1)(A), which provides that an expense that is allocable to a portion of the taxpayer's dwelling that is used exclusively on a regular basis as the taxpayer's "principal place of business" will be allowed as a deduction.  In deciding whether a home office qualifies as a taxpayer's principal place of business, we consider (1) the relative importance of the activities performed at each business location; and (2) the amount of time spent at each location.  <u>Commissioner v. Soliman</u>, 506 U.S. 168, 175 (1993).  The location where a taxpayer contacts clients is an important indicator of the principal place of business.  <u>Id.</u>

Although we are satisfied that Mr. Powerstein worked on client matters from the Addison mobile home, we are not persuaded that such activity entitles petitioners to home office expense deductions.  For an accountant such as Mr. Powerstein, soliciting business and collecting information from client-taxpayers is as important a function of that trade or business as analyzing the underlying information to report on the returns to be filed with the IRS.  Mr. Powerstein testified that he spent considerable

---

[18](...continued)
by recapture of that depreciation upon the sale of the Coral Springs residence in 1985.

time servicing clients in south Florida, yet he did not elaborate on the amount of time he spent at each location or the functions he performed while there. Nor did petitioners offer any evidence indicating the amount of time and the relative importance of the activities that Mr. Powerstein performed in the Addison mobile home as compared to work conducted in south Florida. We are particularly skeptical of petitioners' claim that Mr. Powerstein used the Addison mobile home as his principal place of business in the light of the fact that he did not meet with clients there. Moreover, on Schedules C attached to the 1984 through 1987 joint returns, petitioners reported that they were not deducting expenses for an office in their home. Their reporting, we believe, is indicative of Mr. Powerstein's state of mind during the years in issue. We doubt that Mr. Powerstein would not have claimed a home office expense deduction if he regarded that residence as his principal place of business, especially because he so liberally claimed deductions to which he was not entitled or failed to report income altogether. We thus hold that petitioners are not entitled to deduct expenses associated with the Addison mobile home, including utilities expenses.

2. <u>Copier</u>

Petitioners contend that they are entitled to a $206 depreciation deduction in connection with a copier which Mr. Powerstein purchased in 1988 for his accounting firm. Attached

to the joint return was Form 4562, which reported 7-year property with a depreciable basis of $1,442.  Mr. Powerstein, however, recorded that the purchase price of the copier was $1,153.  We credit Mr. Powerstein's testimony, and in the light of his handwritten cash disbursements journal, we hold that the copier's depreciable basis was $1,153.  Depreciating the copier by a straight-line method over 7 years, we hold that petitioners are entitled to a depreciation deduction of $165 for 1988 ($1,153 divided by 7 years).[19]  See secs. 167(a), 168(a) through (d).

### 3.   Additional Legal Expenses

Petitioners deducted $946 as legal fees on Schedule C attached to the 1988 joint return.  Petitioners contend that they are entitled to additional deductions of $2,066 for legal fees incurred in connection with Mr. Powerstein's accounting firm. They refer the Court to two separate exhibits which purport to be cashier's checks issued to various law firms but are actually checks or deposit slips for accounts that Mr. Powerstein held at California Federal.  Accordingly, we hold that petitioners have failed to prove their entitlement to additional deductions for legal fees because they have not proved that these fees were paid

---

[19]Whereas petitioners contend that their 1988 net worth should be increased by $1,538 to reflect ownership of the copier, we limit the increased net worth for that copier to the purchase price of the copier, or $1,153.

or that they were ordinary and necessary expenses.  See sec.
162(a).

D.   Schedule F Expenses

Attached to the 1988 joint return was Schedule F, on which
petitioners reported that they were engaged in the trade or
business of farming.  Respondent determined that petitioners were
not engaged in the trade or business of farming during 1988 and
that they could not claim depreciation and expenses as deductions
on Schedule F.  We agree with respondent.

Section 162(a) allows as a deduction all the ordinary and
necessary expenses paid or incurred in carrying on any activity
that constitutes a trade or business.  Section 212 allows as a
deduction all the ordinary and necessary expenses paid or
incurred in carrying on an activity for the (1) production or
collection of income, or (2) management, conservation, or
maintenance of property held for the production of income.
Section 183 generally limits deductions for an activity not
entered into for profit to the amount of the activity's gross
income.  Sec. 183(b).  Section 183(c) defines an activity not
engaged in for profit as "any activity other than one with
respect to which deductions are allowable for the taxable year
under section 162 or under paragraph (1) or (2) of section 212."

To be engaged in a trade or business, the taxpayer must
conduct the activity with continuity, regularity, and for the

primary purpose of realizing income or profit. <u>Commissioner v. Groetzinger</u>, 480 U.S. 23, 35 (1987). While a reasonable expectation of profit is not required, the objective facts and circumstances must demonstrate an actual and honest objective to realize a profit. <u>Osteen v. Commissioner</u>, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-519; sec. 1.183-2(a), Income Tax Regs. Greater weight is given to objective facts than a taxpayer's mere statement of his or her intent to make a profit. Sec. 1.183-2(a), Income Tax Regs.

Applying the above principles, we conclude that petitioners were not engaged in the trade or business of farming. They did not consult with an expert or conduct any research on developing the Romeo property into a farm. Although they raised a modest number of cattle, pigs, horses, and chickens, they did not establish that they intended to profit from raising these animals. Nor did they establish that they intended to profit from raising crops which never grew because of "drought conditions". Although an appraisal performed for Sun Bank states that "some farming is planned in the future", we are not persuaded on the basis of the record at hand that petitioners' farming activity rose to the level of being engaged in as a trade or business.

On balance, we believe petitioners' farming activity was more consistent with rural living and not with the trade or

business of farming. We hold that petitioners were not engaged in the trade or business of farming. Because we have found that petitioners' farming activity did not constitute a trade or business or was not entered into for profit, it follows that expenses associated with that activity are limited to the amount of the activity's gross income. See sec. 183(b). Given that petitioners reported zero gross income from their farming activity on Schedule F attached to the 1988 joint return, it follows that they are not entitled to any deduction in connection with their farming activity.

## IV. Income Averaging

Petitioners contend that for 1984 and 1986 they are entitled to special income-averaging provisions afforded taxpayers under section 1305. That section, which was repealed for tax years beginning after December 31, 1986, by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 141(a), 100 Stat. 2117, allows for averaging of damages arising from causes of action for breach of contract or breach of fiduciary duty. Petitioners' unreported income is attributable to Mr. Powerstein's accounting firm and not to an award of damages for breach of contract or breach of fiduciary duty. Thus, section 1305 is not applicable.

## V. Interest Expense

Mr. Powerstein contends that he is entitled to a $65,778 interest expense deduction for interest that respondent jeopardy-

assessed during 1989.  Respondent answers that the interest is nondeductible personal interest within the purview of section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987) (regulation).  Mr. Powerstein urges the Court to invalidate the regulation on the basis of our reasoning in Redlark v. Commissioner, 106 T.C. 31 (1996), revd. and remanded 141 F.3d 936 (9th Cir. 1998).  We decline to do so.

We had occasion to carefully consider the validity of the regulation in Robinson v. Commissioner, 119 T.C. 44, 73-75 (2002), a Court-reviewed Opinion.  In Robinson, we concluded that the regulation was valid, that our Opinion in Redlark should no longer be followed, and that interest paid on individual tax liabilities relating to income from a sole proprietorship is to be treated as nondeductible personal interest.  Id. at 75.  While we are not aware of any decision in the Court of Appeals for the Eleventh Circuit deciding the validity of the regulation, we note that our decision in Robinson is consistent with opinions of the Courts of Appeals for the Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits.[20]  We see no reason to disturb our decision

---

[20]See Alfaro v. Commissioner, 349 F.3d 225, 231 (5th Cir. 2003), affg. T.C. Memo. 2002-309; Kikalos v. Commissioner, 190 F.3d 791, 798-799 (7th Cir. 1999), revg. T.C. Memo. 1998-92; McDonnell v. United States, 180 F.3d 721, 723 (6th Cir. 1999); Allen v. United States, 173 F.3d 533, 538 (4th Cir. 1999); Redlark v. Commissioner, 141 F.3d 936, 937-938, 942 (9th Cir. 1998), revg. and remanding 106 T.C. 31 (1996); Miller v. United States, 65 F.3d 687, 691 (8th Cir. 1995).

in Robinson, and therefore we reject petitioners' invitation to invalidate the regulation.  It follows that interest respondent jeopardy-assessed is nondeductible personal interest.

VI.  Additions to Tax

A.  Fraud

Respondent determined that petitioners are liable for additions to tax for fraud under section 6653(b)(1) and (2) with respect to their 1984 through 1988 joint returns.  For 1984 and 1985, section 6653(b)(1) imposed a 50-percent addition to tax on any portion of an underpayment of tax that is due to fraud, and section 6653(b)(2) imposed a 50-percent addition to tax on any interest payable under section 6661 with respect to any portion of an underpayment of tax that is attributable to fraud.  For 1986 and 1987, section 6653(b)(1)(A) imposed a 75-percent addition to tax on any portion of an underpayment of tax due to fraud, and section 6653(b)(1)(B) imposed a 50-percent addition to tax on any interest payable under section 6661 with respect to any portion of an underpayment of tax that is attributable to fraud.  For 1988, section 6653(b)(1) imposed a 75-percent addition to tax where any portion of an underpayment of tax is due to fraud.  For all years, in the case of a joint return the additions to tax imposed by section 6653(b)(1) and (2) do not apply to a spouse unless some part of the underpayment is attributable to the fraud of that spouse.  Sec. 6653(b)(4) (as in

effect for 1984 and 1985), sec. 6653(b)(3) (as in effect for 1986 through 1988).

The Commissioner bears the burden of establishing fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Clear and convincing evidence is that degree of proof that produces "'a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 516 (1990) (quoting Cross v. Ledford, 120 N.E.2d 118, 123 (Ohio 1954)). To carry his burden, the Commissioner must prove as to each taxpayer for each year in which fraud is alleged that (1) an underpayment of tax existed, and (2) each taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). We consider whether respondent has met his burden as to each of Mr. Powerstein and Ms. Rosen.

1.  <u>Mr. Powerstein</u>

  a.  <u>Collateral Estoppel</u>

We begin by recognizing that Mr. Powerstein was convicted of income tax evasion under section 7201 for 1987. As a result, Mr. Powerstein is collaterally estopped from denying civil fraud with respect to 1987. See <u>Gray v. Commissioner</u>, 708 F.2d 243, 246 (6th Cir. 1983), affg. T.C. Memo. 1981-1. We next consider whether Mr. Powerstein is liable for additions to tax for fraud for 1984, 1985, 1986, and 1988. We hold he is.

  b.  <u>Underpayment of Tax</u>

The Commissioner can prove an underpayment of tax stemming from unreported and indirectly reconstructed income by, among other means, proving a likely source of the unreported income. <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 873-874 (1991), affd. 959 F.2d 16 (2d Cir. 1992). To satisfy his burden, respondent submitted into evidence records showing that petitioners deposited and/or invested substantial sums of money in bank accounts, investments, and real estate. Respondent also established that petitioners received these moneys in connection with Mr. Powerstein's accounting firm. The record clearly and convincingly establishes that petitioners understated their income by more than $450,000. We find that respondent has clearly and convincingly proven the first element of fraud.

### c. Fraudulent Intent

Whether a portion of the underpayment of tax is attributable to fraud is a question of fact to be resolved on the basis of the record as a whole. Parks v. Commissioner, supra at 660. Fraud has been defined as the intentional commission of an act or acts for the specific purpose of evading taxes believed to be owing. Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). "'Fraud implies bad faith, intentional wrong doing and a sinister motive.'" Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968) (quoting Carter v. Campbell, 264 F.2d 930, 935 (5th Cir. 1959)), affg. T.C. Memo. 1966-81. Fraud is never imputed or presumed but must be established by clear and convincing evidence that establishes fraudulent intent. Petzoldt v. Commissioner, supra at 699. Fraud need not be established by direct evidence because such evidence is rarely available but can be shown by surveying the taxpayer's entire course of conduct and drawing reasonable inferences therefrom. Biggs v. Commissioner, 440 F.2d 1, 5 (6th Cir. 1971), affg. T.C. Memo. 1968-240. We may infer fraud from "any conduct, the likely effect of which would be to mislead or to conceal." Spies v. United States, 317 U.S. 492, 499 (1943).

Courts often rely upon certain indicia or badges of fraud in deciding whether a taxpayer acted with fraudulent intent. These badges of fraud include: (1) A pattern of understating income,

(2) giving implausible or inconsistent explanations of behavior, (3) concealing income and/or assets, (4) failing to cooperate with taxing authorities, (5) an intent to mislead, which may be inferred from a pattern of conduct; (6) providing false documents; and (7) dealing in cash.  See id.; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).  No single factor is dispositive, though the existence of several indicia is competent evidence of fraud.  See Niedringhaus v. Commissioner, supra at 211.  In determining the existence of fraud, we may look to evidence of prior and subsequent similar acts reasonably close to the years at issue.  Tipton v. Commissioner, T.C. Memo. 1994-624 (citing United States v. Johnson, 386 F.2d 630 (3d Cir. 1967)).

### i.    Understatements of Income

The consistent and substantial understatement of income over several years is strong evidence of fraudulent intent.  Korecky v. Commissioner, supra at 1568 (citing Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172).  Between 1984 and 1988 petitioners failed to report or account for more than $450,000 of income which Mr. Powerstein earned through his accounting firm.  The evidence clearly and convincingly establishes that petitioners substantially understated their taxable income from 1984 through 1988.  The failure to report this income is strong evidence of fraud.

ii. <u>Implausible Explanations of Behavior</u>

Giving implausible or inconsistent explanations of behavior may implicate fraudulent intent. <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Mr. Powerstein consistently exhibited implausible behavior suggesting fraudulent intent. As a college graduate and a C.P.A., Mr. Powerstein is knowledgeable in tax matters and was capable of preparing accurate returns for 1984 through 1988. Nevertheless, he omitted from each of the 1984 through 1988 joint returns substantial income earned from the accounting firm. In preparing petitioners' joint returns for those years, Mr. Powerstein also understated capital gains, overstated capital losses, and/or omitted interest and dividend income.[21]

Mr. Powerstein also exhibited implausible behavior in the loan applications that he submitted to banks. Each of those loan applications reported income substantially higher than that reported to respondent for Federal income tax purposes. First, Mr. Powerstein reported on the 1977 loan application that he expected to earn $24,185 of income from his accounting firm, yet the 1977 joint return reported that he earned only $3,289 from that business. Second, although he reported on the 1978 loan

---

[21]Although respondent does not contend that the rental income petitioners received in connection with the Coral Springs residence was taxable to them, we observe that such income is ordinarily taxable. See sec. 61(a)(5).

application that he expected to earn $31,262 from his accounting firm, the 1978 joint return reported that he earned only $3,060 from that business. Third, the 1984 loan application estimated income from his accounting firm of $26,000, but the 1984 joint return claimed a loss of $996 from that business. Fourth, attached to the 1983 loan application were the purported 1981 and 1982 returns, each of which reported income different from that reported on the corresponding 1981 and 1982 joint return filed with respondent. We find it implausible that an uncorrupted individual would attach false tax returns to a loan application. We also doubt that Mr. Powerstein's gross underestimation of his income was harmless.

Also indicative of fraud is that Mr. Powerstein was unable to offer any logical explanation for his behavior. He evaded basic questions about the letter he drafted to his clients. He was unable to rationalize the differences in income reported on the loan applications submitted to banks and the joint returns filed with respondent. He sought to explain his actions by suggesting that he neglected himself and his personal Federal income tax returns to place his clients' needs first. We doubt that placing his clients' needs above his own would lead him to file false returns absent fraudulent intent. Such behavior supports a consistent pattern of fraud before 1984 and continuing throughout 1988.

### iii. Concealment of Income or Assets

Fraud may be implicated where a taxpayer conceals assets or income. Spies v. United States, 317 U.S. at 499. Petitioners' use of nominees to place assets beyond the reach of the Federal Government supports a finding of fraudulent intent. Between February 23 and May 25, 1989, Mr. Powerstein and Ms. Rosen transferred approximately 30 bank accounts to Ms. Ballard and Ms. I. Powerstein individually or in trust for K.B. They transferred the vacation home and the Romeo property to Ms. Ballard and Ms. I. Powerstein for $20. On the record as a whole, we believe it reasonable to conclude that petitioners transferred these assets in an attempt to place them beyond the reach of the Government. Such acts favor a finding of fraudulent intent.

### iv. Accurate Returns

The failure to file accurate tax returns may indicate fraudulent intent. Mr. Ballard testified credibly that amounts reported as loans from shareholders on the Federal income tax returns for M&M were "stretched". For example, Mr. Ballard attributed expenses provided by Mr. Powerstein as consisting of $14,000 for a tractor, $600 for a chainsaw, and then amounts for ropes, fertilizer, and other equipment. Mr. Powerstein also purchased other items such as a riding lawnmower for $1,425 on February 5, 1983. The 1984 and 1985 returns for M&M reported that Mr. and Ms. Ballard made more than $63,000 in loans to that

company even though neither individual had the financial wherewithal to contribute such moneys.

### v.    Illegal Activities

A criminal conviction for engaging in illegal activities may be probative of fraudulent intent. Bradford v. Commissioner, supra at 308. We consider it significant that Mr. Powerstein pleaded guilty to income tax evasion under section 7201 for 1987. Although his conviction does not decidedly establish fraudulent intent with respect to 1984 through 1986 and 1988, we consider that crime evidence of a propensity to defraud. See McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

In connection with the plea agreement, Mr. Powerstein admitted to preparing Forms W-2 that overreported Federal income taxes withheld for 79 client-taxpayers. He wrote a letter during 1985 that acknowledged, either explicitly or implicitly, that he mischaracterized his client-taxpayers' Federal tax treatment of dividends, pension distributions, political party contributions, and basis. Mr. Powerstein also deliberately misrepresented the investments of those client-taxpayers to the IRS and claimed exemptions to which he admitted that they were "not entitled". Although this letter is direct evidence of his fraud for 1983, we also rely on that letter as evidence of Mr. Powerstein's attempts to conceal and mislead the Government in determining his client-

taxpayers' Federal income tax liabilities.  Cf. Richardson v. Commissioner, 509 F.3d 736, 743-744 (6th Cir. 2007) (considering a taxpayer's actions after returns have been filed to determine his earlier state of mind), affg. T.C. Memo. 2006-69.  Such behavior favors a finding of fraudulent intent.

### vi.  Dealing in Cash

A taxpayer's use of cash evidences fraudulent intent because it demonstrates a desire to avoid detection of income-producing activities.  Bradford v. Commissioner, 796 F.2d at 308.  Mr. Powerstein kept numerous bank accounts, and he dealt with many of his clients in cash both before and after the years at issue.  Such dealings in cash favor a finding of fraudulent intent.

### vii. Summary

After applying the foregoing factors, we are satisfied that respondent has clearly and convincingly proved that Mr. Powerstein filed the 1984 through 1986 and 1988 joint returns intending to conceal, mislead, or otherwise prevent the collection of taxes.  Respondent has therefore satisfied the second prong of the fraud test as to Mr. Powerstein.  For each of the years 1984 and 1985, we hold that Mr. Powerstein is liable for an addition to tax equal to 50 percent of the underpayment of tax for that year.  See sec. 6653(b)(1); Harvey v. Commissioner, T.C. Memo. 1999-229.  With respect to additions to tax under section 6653(b)(1) for 1988, section 6653(b)(2) for 1984 and

1985, and section 6653(b)(1)(A) and (B) for 1986 and 1988, Mr. Powerstein is liable for those additions to tax only on the portions of the underpayments attributable to fraud. See Harvey v. Commissioner, supra. The burden of proving by a preponderance of the evidence that a portion of the underpayment for each year is not attributable to fraud lies with Mr. Powerstein; otherwise the entire underpayment is subject to the fraud addition to tax.

> d.    Portion of Underpayment Attributable to Fraud

Petitioners contend that the portions of the underpayments attributable to the gain on the sale of the of the Coral Springs residence, their farming activity, capital gains on the sale or disposition of certain stock, and "relatively small amounts of interest and dividend" were not attributable to fraud. We agree in part. With respect to that portion of the deficiency from the gain on the sale of the Coral Springs residence, we conclude that the underpayment was not attributable to fraud. Attached to the 1985 joint return was Form 2119, Sale or Exchange of Principal Residence, which reported the selling price of the Coral Springs residence and petitioners' perceived basis in that property. As evidenced by the fact that Form 2119 was filed, albeit incorrectly, we do not believe that petitioners reported the sale of the Coral Springs residence intending to conceal, mislead, or otherwise prevent the collection of tax.

As to that portion of the deficiency attributable to their alleged farming activity, we find that the underpayment is not attributable to fraud.  Petitioners attached to the 1988 joint return Schedule F alerting respondent to their farming activity, and respondent disallowed those losses in connection with his criminal investigation of Mr. Powerstein.  Although petitioners' position regarding the status of their farming activity as a trade or business was wrong, it was not entirely unreasonable and did not rise to the level of intending to mislead, conceal, or otherwise prevent the collection of tax.  Accordingly, we hold that the portion of the underpayment attributable to petitioners' farming activity was not attributable to fraud.

As to that portion of the deficiency attributable to capital gains, interest income, and dividend income which Mr. Powerstein "overlooked" in preparing the 1986 and 1988 joint returns, we conclude that those underpayments were attributable to fraud. Mr. Powerstein devised a scheme to conceal his income from respondent.  As evidenced by Mr. Powerstein's letter to two clients in 1985, he misstated capital transactions, interest income, and dividend income which he believed the IRS was unable to "track".  We believe that petitioners employed a similar strategy on their joint returns.  Omitting such gains and income allowed Mr. Powerstein to further conceal his income fraudulently in an attempt to conceal, mislead, and otherwise frustrate the

collection of taxes.  We thus hold that portions of the underpayment attributable to unreported capital gains and to interest and dividend income are attributable to fraud.  It follows that Mr. Powerstein is liable for additions to tax under section 6653(b)(1) for 1988, section 6653(b)(2) for 1984 and 1985, and section 6653(b)(1)(A) and (B) for 1986 and 1988, to the extent stated herein.

### 2.  Ms. Rosen

On our review of the record, we are not convinced that respondent has carried his burden of proving fraud by clear and convincing evidence as to Ms. Rosen.  Although she signed the 1984 through 1988 joint returns, which substantially understated petitioners' income, and aided the fraudulent transfer of assets to family members, we are left with only a suspicion of fraud on her part.  She did not understand accounting, was unfamiliar with the bank accounts and recordkeeping of Mr. Powerstein, and was not involved with the accounting firm whatsoever.  While we have our suspicions as to whether Mr. Powerstein explained the nuances of his fraudulent scheme to Ms. Rosen, such suspicions do not warrant imposition of the fraud addition to tax absent more compelling evidence.  See Gow v. Commissioner, T.C. Memo. 2000-93, affd. 19 Fed. Appx. 90 (4th Cir. 2001).  In this regard, respondent has failed to satisfy his burden of proof with respect

to Ms. Rosen.  We therefore hold that she is not liable for fraud additions to tax for 1984 through 1988.

B.    Section 6661

Respondent determined that petitioners are liable for additions to tax under section 6661 for 1985 through 1988.  For tax returns due on or before December 31, 1986, section 6661(a) imposed an addition to tax for substantial understatements of income tax equal to 10 percent of the underpayment attributable to the understatement.  Pallottini v. Commissioner, 90 T.C. 498, 500-503 (1988).  The amount of the section 6661(a) addition to tax was subsequently increased to 25 percent for returns due on or after January 1, 1987.  An understatement is substantial if it exceeds the greater of:  (1) 10 percent of the tax required to be reported on the return, or (2) $5,000.  Sec. 6661(b)(1)(A).  An understatement is reduced to the extent that the understatement is attributable to any item which is (1) supported by substantial authority, or (2) adequately disclosed in the return or in a statement attached to the return.  Sec. 6661(b)(2)(B).

Petitioners did not adequately disclose the amounts leading to the understatements on their 1985 through 1988 returns.  Nor have they cited any authority to support the understatements.  We therefore sustain respondent's determination that petitioners are liable for additions to tax under section 6661.

VII. <u>Epilogue</u>

We have considered all arguments raised by the parties, and to the extent not discussed herein we conclude that they are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.