T.C. Memo. 2013-279

UNITED STATES TAX COURT

JAMIL E. ABDALLAH AND MAJEDA J. ABDALLAH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8023-11.                          Filed December 9, 2013.

<u>D. Douglas Metcalf</u>, for petitioners.

<u>Rachael J. Zepeda</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>: The petition in this case involves petitioners' Federal

income tax for 1999 through 2004. In a notice of deficiency dated February 3,

[*2] 2011, respondent determined deficiencies and fraud penalties[1] under section

6663[2] as follows:

| Year | Deficiency | Penalty sec. 6663 |
|------|------------|-------------------|
| 1999 | $27,021 | $19,898 |
| 2000 | 47,340 | 35,225 |
| 2001 | 66,722 | 49,637 |
| 2002 | 59,905 | 44,929 |
| 2003 | 69,996 | 52,497 |
| 2004 | 85,479 | 50,644 |

The issues for decision are:

(1) whether petitioners failed to report income of $94,669 for 1999,

$156,616 for 2000, $213,561 for 2001, $206,192 for 2002, $225,434 for 2003, and

$270,020 for 2004. We hold that petitioners did fail to report certain income for

all years at issue, but only to the extent stated herein;

(2) whether any part of any of petitioners' underpayments of tax for 1999

through 2003 was due to fraud, such that under section 6501(c) tax may be

assessed at any time. We hold that it was for all years;

---

[1]Respondent does not assert the fraud penalty against Mrs. Abdallah.

[2]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]**  (3) whether petitioner husband is liable for the fraud penalty for 1999 through 2004.  We hold that he is for all years;

(4) whether petitioners are entitled to refunds of payments of $45,669 for 2002, $47,381 for 2003, and $31,959 for 2004.  We hold that they are not.

Petitioners resided in Arizona when they filed their petition.

FINDINGS OF FACT

Mr. Abdallah was born in Israel, but has dual citizenship by virtue of his father's American citizenship.  In Israel Mr. Abdallah attended high school where he was trained as an electrician.  After high school he did not go on to college nor take any courses in bookkeeping.

In 1990 Mr. Abdallah came to the United States.  While Mr. Abdallah's primary language is Arabic, he also speaks some English and Spanish.  Mr. Abdallah is the sole provider for his wife and four children.[3]

Supermat #16

In 1991 Mr. Abdallah opened a laundromat which he named Supermat #16 (Supermat).  Supermat provided coin-operated self-service laundry machines, dry cleaning services, and wash-and-fold services.  In addition to its laundry services,

---

[3]Petitioners claimed three children as dependents on their 1999 through 2002 returns and claimed a fourth child on their 2003 and 2004 returns.

[*4] Supermat also sold laundry supplies, phone cards, money grams, and various food items. Mr. Abdallah had an office in the corner of Supermat, which was separated from the rest of the laundromat by a bulletproof window. At that window, customers made all merchandise purchases, dropped off laundry, and paid for dry cleaning and wash-and-fold services. Supermat's regular business hours were 7 a.m. to 10 p.m.

In 1996 Mr. Abdallah sold Supermat but reclaimed it shortly thereafter when the purchaser failed to make the purchase payments. With the exception of that brief period, Mr. Abdallah was the sole owner of Supermat. In addition, Mr. Abdallah and an office cleaner who came once a week were Supermat's only employees. Finally, Mr Abdallah maintained bank accounts for Supermat's operations, which were separate from petitioners' personal bank accounts.

Petitioners' Check Cashing Activity

Mr. Abdallah began cashing checks out of Supermat's corner office in 1998. His customers primarily cashed payroll checks and were primarily of Hispanic descent. At trial Mr. Abdallah explained that these customers could not go to a bank because they did not have valid government-issued identification. Mr. Abdallah further acknowledged that many of his customers may have been illegal immigrants. For his check cashing services Mr. Abdallah charged a .75% fee.

[*5]   For the years at issue Mr. Abdallah cashed millions of dollars' worth of checks, thereby generating substantial fees, which constituted petitioners' primary source of income.  Petitioners did not report these fees, which are as follows:[4]

| Year | Total deposits[1] | Unreported income |
|------|------------------|-------------------|
| 1999 | $13,988,074 | $59,349 |
| 2000 | 20,736,707 | 104,533 |
| 2001 | 26,713,928 | 146,496 |
| 2002 | 28,751,965 | 154,655 |
| 2003 | 28,839,442 | 169,592 |
| 2004 | 30,542,372 | 155,702 |
| Total | 149,572,488 | 790,327 |

[1]Although calculating the total amount of checks cashed requires certain credit and debit adjustments to be made to total deposits, these adjustments are negligible and do not detract from demonstrating the sheer magnitude of Mr. Abdallah's check cashing activities.

Mr. Abdallah maintained bank accounts for his check cashing activity separate from petitioners' personal accounts and separate from Supermat's operating accounts.  Every week the bank would deliver a cash shipment to Supermat in an armored vehicle.  Mr. Abdallah then deposited the checks that he

---

[4]For 1999 through 2001, respondent calculated total deposits by adding together all check deposits in petitioners' check cashing bank accounts. Respondent then determined petitioners' unreported income by applying a .75% fee to the total deposits and adjusting for bank fees and bad checks.  For 2002 through 2004 respondent based Mr. Abdallah's total check deposits and unreported income on petitioners' amended 2002, 2003, and 2004 returns, further discussed infra.

**[*6]** cashed daily. Mr. Abdallah did not keep records of the checks he cashed, his fees earned, nor any other records for his check cashing activity.

For the years at issue, two signs at Supermat advertised Mr. Abdallah's check cashing services. The first sign was directly above the office window through which Mr. Abdallah cashed checks, sold merchandise, and received clothing for dry cleaning. This sign was approximately three feet by two feet, had a yellow background, and advertised check cashing in both English and Spanish in red font. The second sign was on the front door, was approximately the same size as the door, and was also red and yellow.

Petitioner Hires Essex Peters as Accountant

After opening Supermat in 1991 Mr. Abdallah began filing Federal income tax returns. Mr. Abdallah has always relied on an accountant to prepare his returns.

Essex Peters is an accountant of 25 years' experience. He is not a certified public accountant (C.P.A.), nor an enrolled agent with the Internal Revenue Service (IRS), nor does he have any other official license that allows him to prepare tax returns. Further, Mr. Peters has no experience or training in forensic accounting.

**[*7]** In 2000 Mr. Peters began taking his laundry to Supermat for wash-and-fold services every month. In 2002 Mr. Abdallah learned that Mr. Peters was the accountant for a nearby bar, Patrick's. At the time, having ended his relationship with his prior accountant in 1999, Mr. Abdallah was three years behind in filing his Federal income tax returns. After learning that Mr. Peters was an accountant, Mr. Abdallah hired him to prepare his 1999, 2000, and 2001 Federal income tax returns.

In December 2002 Mr. Peters also helped Mr. Abdallah incorporate Supermat as an S corporation called Vuvo, Inc. (Vuvo). Mr. Peters further prepared Mr. Abdallah's 2002, 2003, and 2004 Federal income tax returns, as well as Vuvo's 2003 and 2004 Federal income tax returns.

Mr. Abdallah signed the returns Mr. Peters prepared, thereby certifying for each that "[u]nder penalty of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete." Mr. Abdallah's returns for the years 1999 through 2004 reported gross income, income tax, and total tax liability as follows:

[*8]

| Year | Total income | Income tax (before credits) | Total tax (including FICA/SECA) |
|---|---|---|---|
| 1999 | $13,883 | -0- | $979 |
| 2000 | 9,718 | -0- | 748 |
| 2001 | 9,337 | -0- | 1,078 |
| 2002 | 9,217 | -0- | 1,075 |
| 2003 | 34,090 | -0- | 503 |
| 2004 | 30,035 | -0- | 81 |
| Total | 106,280 | -0- | 4,464 |

In addition to his Federal tax returns, Mr. Abdallah also employed Mr. Peters to prepare Supermat's financial statements, City of Tempe sales tax returns, and State of Arizona sales tax returns on a monthly basis starting in 2003. Mr. Abdallah further employed Mr. Peters to prepare his annual State of Arizona income tax returns. To prepare Mr. Abdallah's City, State, and Federal tax returns, as well as Supermat's financial statements, Mr. Abdallah allegedly gave Mr. Peters a box filled with Supermat's bank statements, commission checks from money grams, purchase receipts for laundry supplies, and check stubs for expenses paid. According to Mr. Peters, most of Supermat's expenses were documented by check stubs or bank statements.

Every month, Mr. Peters would visit Supermat to drop off his laundry, Supermat's financial statements, and Mr. Abdallah's City and State sales tax

[*9] returns for a prior month. During these visits Mr. Peters would also pick up a box of Supermat's bank statements and various receipts to prepare the next month's books and records. Mr. Peters returned Supermat's bank statements by attaching them to the financial statements he had prepared. Mr. Abdallah then placed the financial statements and bank records in a binder. While the record is unclear whether Mr. Peters ever returned the various receipts and check stubs to Mr. Abdallah, these records are no longer available. Finally, Mr. Peters admitted that he often drank at Patrick's before making these monthly visits.

Before July 2004 Supermat's financial statements did not include petitioners' check cashing income. Mr. Abdallah never told Mr. Peters his fee for check cashing services, nor did Mr. Peters inquire as to the fee even after he learned of the check cashing income.

Criminal Case for 2004 Return and Resulting Plea Agreement

In September 2005 the IRS began a criminal investigation relating to petitioners' 2004 return.

On October 13, 2005, Mr. Abdallah was interviewed by IRS Special Agent Ken Hudson and Supervisory Special Agent Iris Bohannon. The interview lasted nearly two hours, and Mr. Abdallah voluntarily answered the IRS Agents' questions. Also during that interview, Mr. Abdallah turned over the binder of

[*10] financial statements that Mr. Peters had prepared for Supermat in 2003 and 2004. After the interview with the IRS, Mr. Abdallah terminated his business relationship with Mr. Peters.

The IRS also interviewed Mr. Peters in October 2005. According to Mr. Peters, the IRS never requested from him a copy of petitioners' records during the October 2005 interview; and because his computer was later stolen, these records were no longer available when the IRS interviewed him again approximately two years later.

Mr. Abdallah understood that he could go to prison if convicted of criminal tax fraud. On August 5, 2008, Mr. Abdallah entered into a plea agreement with the Government in order to avoid going to prison and to put an end to the criminal case.

In the plea agreement Mr. Abdallah pleaded guilty to violating section 7206(1), "Willfully Making and Subscribing a Materially False Return, Statement or Other Document". As part of the plea agreement, Mr. Abdallah admitted that he "knowingly and intentionally underreported [his] income to the Internal Revenue Service in order to pay less in taxes." In addition, the plea agreement provided that "this agreement does not preclude the United States from instituting any other civil or administrative proceedings" but that "[n]othing in this agreement

[*11] shall be construed to satisfy, settle, or compromise any civil tax liability, including additions to tax, interest and penalties, that the defendant may owe to the IRS as to his federal income tax returns." The plea agreement further provided that "the defendant shall retain the right to assert any and all defenses in any civil tax audit, controversy, appeal or litigation." Finally, the plea agreement required Mr. Abdallah to file amended returns for 2002, 2003, and 2004.

On December 24, 2008, the U.S. District Court for the District of Arizona entered a judgment and a fine of $10,000 against Mr. Abdallah. The judgement provided that Mr. Abdallah "[has] been sentenced in accordance with the terms of the plea agreement and that * * * [he has] waived * * * [his] right to appeal and to collaterally attack this matter."

Mr. Abdallah hired Joel Ruben, a C.P.A. with 47 years' experience in accounting and a partner at Pater & Ruben, to prepare his amended returns for 2002, 2003, and 2004. According to Mr. Ruben, the records for those years were "very shallow" and Mr. Abdallah's income and expenses for those years had to be recreated. He also testified that there was no evidence that a system for keeping track of check cashing income had been in place. Mr. Abdallah's amended returns reported taxable income and tax liability as follows:

[*12]

| Year | Total income (amended) | Income tax (amended) (before credits) | Total tax (amended) (including FICA/SECA) |
|------|------------------------|---------------------------------------|-------------------------------------------|
| 2002 | $166,694 | $31,333 | $46,206 |
| 2003 | 192,872 | 32,696 | 47,632 |
| 2004 | 173,164 | 26,369 | 32,040 |

On March 13, 2009, petitioners made voluntary payments of $45,669 towards their 2002 tax liability, $47,381 towards their 2003 tax liability, and $31,959 towards their 2004 tax liability.

Petitioners' Other Assets

In late 1998 petitioners purchased a piece of real property on W. Dublin St. in Chandler, Arizona. In early 2000 petitioners purchased another piece of property, on E. Pueblo Ave. in Chandler, Arizona. Petitioners purchased this property for $138,000 and made a downpayment of $7,500. In early 2003 petitioners purchased yet another piece of property, on E. Scorpio Place in Chandler, Arizona. Petitioners purchased this property for $234,384 and made a downpayment of $46,877. In mid-2003 petitioners sold their W. Dublin St. property.

Petitioners' Loan Applications

In 2002 Mr. Abdallah submitted a "Uniform Residential Loan Application" (Freddie Mac Form 65) to Spectrum Financial Group, in which he reported his

[*13] monthly income from Supermat as $9,000.  In 2003 Mr. Abdallah submitted yet another "Uniform Residential Loan Application" (Freddie Mac Form 65) to Spectrum Financial Group, in which he also reported his monthly income from Supermat as $9,000.  In both applications Mr. Abdallah disclosed that he had monthly mortgage payments on his W. Dublin St. property of $852 and additional monthly loan payments of $792.  Finally, Mr. Abdallah signed the applications, thereby certifying "that the information provided in this application is true and correct as of the date set forth opposite * * * [his] signature[] on this application" and acknowledging his "understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et. seq.".

OPINION

The primary issue in this case is whether Mr. Abdallah fraudulently underreported his income with regard to his 1999 through 2004 returns.  The parties have stipulated or otherwise conceded on brief that Mr. Abdallah failed to report income of $59,349 for 1999, $104,533 for 2000, $146,496 for 2001, $154,655 for 2002, $169,592 for 2003, and $155,702 for 2004.

**[\*14]** I.     <u>Perception of Witnesses</u>

We observe the candor, sincerity, and demeanor of each witness in order to evaluate his testimony and to assign weight to that testimony for the primary purpose of finding disputed facts. <u>HIE Holdings, Inc. v. Commissioner</u>, T.C. Memo. 2009-130, 97 T.C.M. (CCH) 1672, 1733 (2009), <u>aff'd without published opinion</u>, 521 Fed. Appx. 602 (9th Cir. 2013). We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. <u>Id.</u> We will not accept a witness' testimony at face value if we find that our impression of the witness, coupled with our review of the credible facts at hand, conveys to us an understanding contrary to the spoken word. <u>Id.</u> (citing <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 84-87 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002)).

During trial we heard the testimony of four fact witnesses: Mr. Peters, Mr. Abdallah, Revenue Agent John Schiffer (Agent Schiffer), and Mr. Ruben. As explained more fully below, we found that Mr. Peters and Mr. Abdallah lacked credibility as to the material issues. Also more fully explained below, we found Agent Schiffer's and Mr. Ruben's testimony to be of limited helpfulness. Therefore, we rely primarily on the record built by the parties through their stipulation of facts and exhibits.

[*15]  A.    Mr. Peters

As to Mr. Peters, petitioners' accountant, we perceived him to be generally untrustworthy and found his testimony to be incredible with regard to material aspects of this case.  Mr. Peters' testimony was internally inconsistent and contradicted by the documentary evidence and stipulated facts.  In addition, Mr. Peters demonstrated a lack of understanding of Federal tax laws.  We illustrate these observations through the following examples.

First, of significance to this case is whether Mr. Abdallah fraudulently underreported income from check cashing.  Mr. Abdallah claims that he provided information on check cashing income to Mr. Peters so that Mr. Peters could report petitioners' correct income.  Mr. Peters essentially denies this and states that he was, for the most part, unaware that petitioners had substantial check cashing income.  Mr. Peters claimed that he never saw any check cashing signs while at Supermat.  We find this claim to be highly improbable given the size, prominent location, and prominent color scheme of the two check cashing signs, the regular line of customers outside the check cashing and laundry dropoff window, and Mr. Peters' frequent and regular visits over many years.  Further, Mr. Peters noticed that the establishment across the street offered check cashing service but incredibly failed to notice that his own client offered the same service.

[*16] Second, Mr. Peters testified that he first learned of Mr. Abdallah's check cashing activities in July 2004, when he came across a bank statement from petitioners' check cashing account ending in 4406. However, Schedule C, Profit and Loss from Business, of petitioners' 2003 return shows income from "Phonecards, Moneygrams, [and] Checking Cashing [sic]". When questioned about this, Mr. Peters admitted that he was aware of a small amount of check cashing activity before 2004 and that he saw customers cashing checks as early as 2002. Mr. Peters further testified that after discovering the check cashing account ending in 4406, he began reporting check cashing income in subsequent months, but did not do so for prior months because the July 2004 bank statement showed an opening balance of zero. In reality, the July 2004 bank statement showed an opening balance of nearly $150,000, and prior bank statements from that account showed deposits were made as early as April of 2003. When questioned about the July 2004 opening balance, Mr. Peters admitted that his prior statement had been false, and that although he should have asked for earlier bank statements, he failed to do so. Mr. Peters also claimed that he was not aware of petitioners' other check cashing accounts; however, the bank statement for petitioners' check cashing account ending in 7687 was attached to Supermat's November 2004 financial statements. Finally, Mr. Peters testified that although he knew Mr. Abdallah

[*17] incurred significant expenses for cash shipments by armored vehicle, Mr. Peters never questioned what those expenses were for. The contradictory and ever-changing nature of Mr. Peters' testimony severely undermines his credibility.

Third, Mr. Peters assisted Mr. Abdallah with a dubious method for reducing self-employment taxes. Mr. Peters testified that Mr. Abdallah asked him to incorporate Supermat in order to reduce Mr. Abdallah's Federal tax liability and that he advised Mr. Abdallah that by incorporating Supermat as an S corporation (i.e., Vuvo), Mr. Abdallah would not be required to pay self-employment taxes. Although incorporating and becoming an employee of Vuvo would relieve Mr. Abdallah of filing self-employment tax returns under section 1401, Vuvo and Mr. Abdallah would be required to pay Social Security and Medicare taxes on Mr. Abdallah's wages pursuant to sections 3101 and 3111 at the same rates. Mr. Peters attempted to avoid the taxes imposed by sections 3101 and 3111 by reporting no wages for Mr. Abdallah and reporting all of Vuvo's profit as distributions of income for 2003 and 2004. Given that Mr. Abdallah worked long hours at Supermat each day, Mr. Peters' advice to disguise wages as distributed earnings in order to avoid payroll taxes runs contrary to Federal tax laws. See Spicer Accounting, Inc. v. United States, 918 F.2d 90, 93 (9th Cir. 1990) (holding that a taxpayer should not be permitted to evade FICA and FUTA by

**[*18]** characterizing compensation paid to its shareholder as dividends, rather than wages); Veterinary Surgical Consultants, P.C. v. Commissioner, 117 T.C. 141, 145-146 (2001) (holding that where an officer of an S corporation performs substantial services, the remuneration received for those services is wages subject to Federal employment tax and not distributions of corporate income), aff'd sub nom. Yeagle Drywall Co. v. Commissioner, 54 Fed. Appx. 100 (3d Cir.2002).

Finally, the cavalier manner in which Mr. Peters practices accounting does not inspire our confidence in his testimony. Mr. Peters testified that he was not sure whether sales of phone cards were taxable for sales tax purposes and admitted that instead of researching the issue, he merely guessed. Mr. Peters' careless practice further contributes to the numerous errors in the financial statements and tax returns that he prepared. For example, Supermat's July and August 2003 profit and loss statements showed sales of $3,286 and $2,320, respectively, yet its City of Tempe sales tax returns reported sales of only $1,000 and $899, respectively. As another example, Supermat's February 2004 profit and loss statement showed total sales of $4,164, yet its State of Arizona sales tax return reported total sales of only $560. When questioned about these discrepancies, Mr. Peters admitted that he filed the city and State sales tax returns before creating the profit and loss

[*19] statements and that he merely guessed what the sales amounts would be. For the reasons stated above, we choose not to credit Mr. Peters with reliable testimony.

B.    Mr. Abdallah

As to Mr. Abdallah, we found portions of his testimony to be incredible as to material aspects of this case. For example, Mr. Abdallah testified that he never looked at his tax returns and that he would just write a check for whatever Mr. Peters told him he owed. We find it highly unlikely that Mr. Abdallah, an experienced businessman who operated a profitable business for many years, signed his returns under penalty of perjury without taking notice of his reported gross income.[5]

C.    Other Witnesses

As for Agent Schiffer and Mr. Ruben, we found their testimony to be credible but of limited helpfulness. Agent Schiffer's testimony was not helpful because he was neither involved in the investigation nor otherwise personally

---

[5]On his 1999 through 2004 returns Mr. Abdallah reported income of $13,883 for 1999, $9,718 for 2000, $9,337 for 2001, $9,217 for 2002, $34,090 for 2003, and $30,035 for 2004, for total reported income of $106,280. For those same years Mr. Abdallah failed to report check cashing income of $59,349 for 1999, $104,533 for 2000, $146,496 for 2001, $154,655 for 2002, $169,592 for 2003, and $155,702 for 2004, for total unreported income of $790,327.

**[*20]** familiar with the case.  Mr. Ruben's testimony was not helpful because his factual knowledge was limited to events that occurred after the years at issue.

II.     Statute of Limitations on Assessment

A central issue in this case is whether the periods of limitations on assessment have expired for the 1999 through 2003 returns.  It is undisputed that petitioners omitted substantial income on all five returns such that the six-year limitations period set forth in section 6501(e) would apply.  It is further undisputed that as to those years, more than six years have elapsed between when the returns were filed and when respondent issued the notice of deficiency.

The issuance of a valid notice of deficiency is an essential prerequisite to the jurisdiction of this Court in a deficiency action.  Laing v. United States, 423 U.S. 161, 165 n.4 (1976).  For a notice of deficiency to be valid, it must be sent to the taxpayer before the period of limitations for assessment has expired.  See sec. 6213(a).  Therefore, whether respondent has issued a valid notice of deficiency, and consequently, whether this Court has deficiency jurisdiction over these five years, depends on whether the limitations periods on assessment are lifted under section 6501(c) upon a finding of fraud.

[*21] III.    Section 6663 Fraud Penalty

Section 6663(a) provides that "[i]f any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment that is attributable to fraud."

A.    Underpayment of Tax

In order to establish liability for the fraud penalty under section 6663(a), the Commissioner must prove by clear and convincing evidence that an underpayment of tax exists.  See sec. 7454(a); Rule 142(b).

Petitioners' underpayment of tax arises from their unreported income.  In the Court of Appeals for the Ninth Circuit, to which this case is appealable absent the parties' stipulation otherwise, see sec. 7482(b), the Commissioner's determination as to unreported income in a notice of deficiency is presumed correct only when it is supported by a minimal evidentiary foundation, Weimerskirch v. Commissioner, 596 F.2d 358, 360-361 (9th Cir. 1979), rev'g 67 T.C. 672 (1977); see also Delaney v. Commissioner, 743 F.2d 670, 671 (9th Cir. 1984) (stating that the Commissioner must produce some substantive evidence demonstrating that the taxpayer received unreported income), aff'g T.C. Memo. 1982-666.

**[\*22]** On the basis of our review of the entire record, we find that respondent has produced sufficient evidence to establish that petitioners did not report income of $59,349 for 1999, $104,533 for 2000, $146,496 for 2001, $154,655 for 2002, $169,592 for 2003, and $155,702 for 2004.  For 1999 through 2003 the parties have stipulated the above-stated amounts of unreported income.  For 2004 petitioners have admitted, by virtue of their 2004 amended return, that they failed to report $155,702 of income.  The parties have also conceded on brief this unreported income amount for 2004.  To put things in perspective, for the six years at issue, petitioners reported on their original returns total income of only $106,280, i.e., 12%, of their actual total income of $896,607.

On the basis of the parties' stipulations and concessions, we hold that respondent has clearly and convincingly established the underpayment element of section 6663.[6]

B.    Fraudulent Intent

The Commissioner must prove by clear and convincing evidence that the taxpayer fraudulently intended to underpay his taxes.  See sec. 7454(a); Rule

---

[6]Pursuant to sec. 1.6664-2(c)(2), Income Tax Regs., for purposes of ascertaining the underpayment on which the sec. 6663 penalty is based, the tax shown on an amended return is not substituted for the tax shown on the return as originally filed if the original return was fraudulent.

**[*23]** 142(b).  Whether an underpayment of tax is attributable to fraud is a question of fact to be resolved on the basis of the record as a whole.  Parks v. Commissioner, 94 T.C. 654, 660 (1990); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978).  Fraud is defined as the intentional commission of an act or acts for the specific purpose of evading tax believed to be owing.  Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989).  Fraudulent intent is never imputed nor presumed but must always be established by independent evidence.  Id. at 699.

1.   2004[7]

Mr. Abdallah admitted to fraud on his 2004 return in connection with his criminal case.  As an initial matter, we address whether the judgment against Mr. Abdallah in the criminal case estops him from litigating the existence of fraud for 2004.  We hold that it does not.

The Arizona District Court judgment held Mr. Abdallah criminally liable under section 7206(1).  Section 7206(1) provides that any person who "[w]illfully makes and subscribes any return * * * which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not

---

[7]The parties agree that the notice of deficiency is timely for 2004.

**[\*24]** believe to be true and correct as to every material matter * * * shall be guilty of a felony".

In Considine v. United States, 683 F.2d 1285, 1287 (9th Cir. 1982), the Court of Appeals for the Ninth Circuit held that a prior criminal conviction under section 7206(1) will not estop a party from later contesting civil fraud because an "intent to evade taxes" was not a necessary element of the criminal conviction. Thus, Mr. Abdallah's criminal conviction under section 7206(1) does not estop him from challenging the penalty for civil fraud under section 6663(a).

The Arizona District Court judgment, however, also incorporated the terms of the plea agreement, and as part of the plea agreement Mr. Abdallah admitted that he "intentionally underreported [his] income * * * in order to pay less in taxes". Therefore, Mr. Abdallah has admitted to fraud--i.e., that he intentionally underreported income for the specific purpose of evading tax. See Petzoldt v. Commissioner, 92 T.C. at 698 ("Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing.").

2.    1999 to 2003

Since fraud is rarely admitted and the taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986),

[*25] aff'g T.C. Memo. 1984-601.  Whether fraud exists in a given situation is a factual determination that must be made after reviewing the particular facts and circumstances of the case.  Bussell v. Commissioner, T.C. Memo. 2005-77, 89 T.C.M. (CCH) 1032, 1038 (2005), aff'd, 262 Fed. Appx. 770 (9th Cir. 2007).

The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499 (1943).  From 1999 through 2004 Mr. Abdallah's business practices and pattern of behavior did not materially change.  Therefore, Mr. Abdallah's admission that he intentionally underreported income for the specific purpose of evading tax for 2004 is circumstantial evidence of his fraudulent intent for 1999 through 2003.

In determining whether a taxpayer had the requisite fraudulent intent, courts have also relied on certain indicia (badges) of fraud.  These badges include:  (1) understating income; (2) maintaining inadequate records; (3) failing to file tax returns; (4) giving implausible or inconsistent explanations of behavior; (5) concealing assets; (6) failing to cooperate with tax authorities; (7) engaging in illegal activities; (8) attempting to conceal illegal activities; and (9) dealing in cash.  Bradford v. Commissioner, 796 F.2d at 307-308.  The presence of several badges is persuasive circumstantial evidence of fraud.  Bussell v. Commissioner,

[*26] 89 T.C.M. (CCH) at 1038. Several badges of fraud exist in this case which clearly and convincingly establish fraud in all five years.

### a. Understating Income

Mr. Abdallah cashed millions of dollars' worth of checks totaling $13,988,074 in 1999, $20,736,707 in 2000, $26,713,928 in 2001, $28,751,965 in 2002, and $28,839,442 in 2003. Petitioners admit that they failed to report check cashing income of $59,349 for 1999, $104,533 for 2000, $146,496 for 2001, $154,655 for 2002, and $169,592 for 2003. In contrast, on their original returns petitioners reported income of only $13,883 for 1999, $9,718 for 2000, $9,337 for 2001, $9,217 for 2002, and $34,090 for 2003. To put things in perspective, petitioners reported merely 19% of their income for 1999, 9% for 2000, 6% for 2001, 6% for 2002, and 17% for 2003. Petitioners' omitted income, which completely dwarfs the income that they did report, constitutes strong evidence of fraud. Parks v. Commissioner, 94 T.C. at 664 ("A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud."); Branson v. Commissioner, T.C. Memo. 2012-124, 103 T.C.M. (CCH) 1680, 1686 (2012) ("A pattern of substantially underreporting income for several years is strong evidence of fraud, particularly if the reason for the understatements is not satisfactorily

**[\*27]** explained or due to innocent mistake."); <u>Powerstein v. Commissioner</u>, T.C.

Memo. 2011-271, 102 T.C.M. (CCH) 497, 515 (2011) (finding strong evidence of

fraudulent intent where, over a period of five years, "petitioners failed to report or

account for more than $450,000 of income").

Moreover, Mr. Abdallah certified under penalty of perjury that he reviewed

his returns and that to the best of his knowledge his returns were true, correct, and

complete.[8] Having reviewed his returns, Mr. Abdallah must have seen that he

reported significantly less income than he was actually making.

Mr. Abdallah knew his check cashing income was substantial for the

following reasons. First, Mr. Abdallah knew that fees generated from his check

cashing business were his primary source of income, with which he

singlehandedly supported his wife and three children (four children in 2003 and

2004). Second, petitioners made substantial investments, partially with their own

funds. For example, in 2000 and 2003 petitioners purchased two pieces of real

property for $138,000 and $234,384 and made downpayments of $7,500 and

$46,877, respectively, with their own funds. Third, petitioners made monthly

---

[8]By signing the returns, Mr. Abdallah certified that "[u]nder penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete."

[*28] mortgage payments of $852--i.e., annual payments of $10,224--on their residence at W. Dublin St. To put things in perspective, during 1999 through 2003 petitioners paid more in mortgage and downpayments alone than they reported as income.

### b. Maintaining Inadequate Records

Taxpayers are required to keep such records as are necessary for the determination of tax. See sec. 6001. We find that Mr. Abdallah's records were poor, inadequate, and incomplete. On brief, petitioners concede that Mr. Abdallah "did not keep contemporaneous records of the fees he collected when he cashed checks", that his recordkeeping was deficient, and that "[t]here is no doubt that Mr. Abdallah was a poor record keeper". Further, Mr. Abdallah testified that every month he threw all of Supermat's records--i.e., bank statements, commission checks, purchase receipts, and check stubs--together in a box which he then gave to Mr. Peters. With the exception of some bank statements, these records are now lost. At all times before they were lost, these records were either in Mr. Abdallah's possession or in the possession of an agent under his control. Further, Mr. Abdallah failed to keep records of the checks he cashed, his fees earned, or any other records for his check cashing activity. Mr. Abdallah's failure to maintain adequate records is indicative of fraud. See, e.g., Scott v. Commissioner,

**[\*29]** T.C. Memo. 2012-65, 103 T.C.M. (CCH) 1310, 1317 (2012) (finding taxpayer's "failure to keep or produce adequate records to support his tax return positions to be an indicium of fraud").

      c.      <u>Giving Implausible or Inconsistent Explanations of Behavior</u>

As we stated earlier, Mr. Abdallah claimed incredibly that he never looked at his tax returns. Mr. Abdallah, however, certified under penalty of perjury that he reviewed his returns and that to the best of his knowledge, his returns were true, correct, and complete. Thus, either he lied to the IRS on his returns or he lied to this Court during trial.

Even if we were to credit Mr. Abdallah's testimony that he did not review his returns (which we do not), experience and common sense render it difficult for us to believe that a reasonable person would not have noticed that his reported tax liabilities were orders of magnitude lower than what one would expect from his earnings. For the six years at issue, Mr. Abdallah paid <u>zero</u> income tax but had nearly $900,000 of total income. Willful ignorance and reckless disregard of the truth are circumstantial evidence of fraud. <u>See</u> <u>United States v. Henderson</u>, 721 F.2d 276, 279 (9th Cir. 1983) (finding that willful ignorance instructions have been found appropriate in fraud cases) (citing <u>United States v. Hanlon</u>, 548 F.2d

**[\*30]** 1096, 1100 n.7 (2d Cir. 1977) (holding that a fact finder may infer fraud from reckless disregard of the truth)).

Finally and significantly, Mr. Abdallah submitted loan applications to Spectrum Financial Group in 2002 and 2003 wherein he represented that he was making $9,000 a month--i.e. $108,000 a year--through Supermat. In contrast, Mr. Abdallah submitted tax returns in 2002 and 2003 representing that he made only $9,217 and $34,090 through Supermat, respectively. Strong evidence of fraudulent intent exists where the taxpayer reports substantially higher income on his loan applications than on his Federal income tax returns. See Powerstein v. Commissioner, 102 T.C.M. (CCH) at 151.

Moreover, by signing both applications, Mr. Abdallah twice certified that the information he provided was correct and twice acknowledged that misrepresentations could result in a violation of 18 U.S.C. sec. 1001.[9] In essence, Mr. Abdallah either made fraudulent representations to the IRS under penalty of perjury or he made fraudulent representations to Spectrum Financial Group in violation of 18 U.S.C. sec. 1001, or both.

_____

[9]We note that a violation of 18 U.S.C. sec. 1001 (2006) is a Federal criminal offense, which could result in imprisonment for up to five years. However, as the issue is not before the Court, we do not address whether Mr. Abdallah's loan applications resulted in such a violation.

[*31] Having established that Mr. Abdallah knew he was underreporting income, we need not make a great leap to conclude that Mr. Abdallah intended to underpay his taxes. When financial incentives existed for him to report high income, such as on loan applications, Mr. Abdallah reported significant monthly income. When financial incentives existed for him to report low income, such as on his tax returns, Mr. Abdallah reported minimal income.

For the foregoing reasons, respondent has clearly and convincingly established that Mr. Abdallah harbored fraudulent intent.

### C. Portion of Underpayment Attributable to Fraud

Once the Commissioner "establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment, which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud." Sec. 6663(b); see also Scharringhausen v. Commissioner, T.C. Memo. 2012-350, at *35 ("[The Commissioner] need only prove clearly and convincingly that there is a deficiency and 'at least some part of the deficiency was due to fraud.'" (quoting Clark v. Commissioner, 266 F.2d 698, 717 (9th Cir.1959), remanding T.C. Memo.1957-129)). Respondent has established by clear and convincing evidence that at least part of each of Mr. Abdallah's underpayments is attributable to fraud.

**[*32]** In addition, Mr. Abdallah has failed to establish by a preponderance of the evidence that any portion of any underpayment is not attributable to fraud. Thus, Mr. Abdallah's entire underpayment for each of 1999 through 2004 is attributable to fraud.

Finally, because we find that petitioners' returns for 1999 through 2003 were fraudulent, the limitations period on assessment is lifted under section 6501(c). Therefore, the notice of deficiency was valid and the Court has deficiency jurisdiction over these five years.

IV.     Refund of Petitioners 2002, 2003, and 2004 Payments

Under the tax regime Congress created, "Congress has * * * established a detailed refund scheme that subjects complaining taxpayers to various requirements before they can bring suit." United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 11 (2008). In postpayment circumstances, "[a] taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims." Id. at 4 (citing 28 U.S.C. sec. 1346(a)(1)). In contrast, the Tax Court's principal jurisdiction is over prepayment "deficiency cases", pursuant to section 6213(a).

**[\*33]** With regard to the Tax Court's overpayment jurisdiction, section 6512(b)(1) provides:

> [I]f the Tax Court finds that there is no deficiency and further finds that the taxpayer has made an overpayment of income tax for the same taxable year * * * or finds that there is a deficiency but that the taxpayer has made an overpayment of such tax, the Tax Court shall have jurisdiction to determine the amount of such overpayment * * *

The existence of deficiencies for 2002, 2003, and 2004 is undisputed. Rather, the parties dispute the existence of an overpayment of tax. Section 6665(a)(2) provides that "any reference in this title [26 of the United States Code (to which section 6512 belongs)] to 'tax' imposed by this title shall be deemed also to refer to the additions to the tax, additional amounts, and penalties provided by this chapter."[10] Therefore, an overpayment of tax under section 6512(b)(1) requires payment in excess of the deficiency plus any penalties and additions to tax. Petitioners' voluntary payments of $45,669 for 2002, $47,381 for 2003, and $31,959 for 2004 do not come close to covering their deficiencies of $45,669 for 2002, $47,381 for 2003, and $31,959 for 2004 plus the 75% fraud penalties.[11] Consequently, there is no overpayment of tax for 2002, 2003, or 2004, and this

---

[10]"[T]his chapter" refers to Chapter 68, Additions to the Tax, Additional Amounts, and Assessable Penalties, to which sec. 6663 belongs.

[11]On brief, respondent concedes these reduced deficiency amounts for 2002, 2003, and 2004.

**[\*34]** Court lacks jurisdiction to order a refund of petitioners' 2002, 2003, or 2004 payment. See sec. 6512(b)(1) and (2).

## V. Mr. Peters' Subpoena

Respondent subpoenaed Mr. Peters to compel him to testify at trial. Respondent served Mr. Peters with the subpoena but did not provide petitioners or the Court with proof of service. Petitioners allege that respondent failed to follow the Tax Court Rules of Practice and Procedure, claim resulting prejudice, and seek to strike Mr. Peters' testimony. Respondent argues that he issued Mr. Peters' subpoena in accordance with the Rules.

Respondent served Mr. Peters with the subpoena but did not provide proof of service to the Court. Rule 21(b)(3) provides that the person serving a subpoena "shall make proof thereof to the Court promptly and in any event within the time in which the person served must respond." Rule 21(b)(3) further provides that "Failure to make proof of service does not affect the validity of the service."

We find that respondent violated Rule 21 by not providing proof of service to the Court. However, we decline to strike Mr. Peters' testimony because petitioners were not prejudiced. Respondent listed Mr. Peters as a potential witness in his pretrial memorandum. Further, absent a claim of privilege, which

**[*35]** petitioners have not asserted, nothing bars Mr. Peters from testifying on respondent's behalf without being subpoenaed.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.